**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GLEN SCOTT MILNER,
            *Plaintiff-Appellant,*

v.

UNITED STATES DEPARTMENT OF THE
NAVY,

            *Defendant-Appellee.*

No. 07-36056

D.C. No.
CV-06-01301-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
March 12, 2009—Seattle, Washington

Filed August 5, 2009

Before: William A. Fletcher, Ronald M. Gould and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman;
Dissent by Judge W. Fletcher

10347

## COUNSEL

David S. Mann and Keith P. Scully, Seattle, Washington, for the appellant.

Peter A. Winn, Assistant United States Attorney, Seattle, Washington, for the appellee.

## OPINION

TALLMAN, Circuit Judge:

This appeal highlights the tension between the public's right of access to government files under the Freedom of

Information Act and the countervailing need to preserve sensitive information for efficient and effective government operations. Glen Scott Milner appeals the denial of a request he filed pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. He sought information that would identify the locations and potential blast ranges of explosive ordnance stored at Washington's Naval Magazine Indian Island ("NMII"). The district court granted summary judgment in favor of the Navy. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I

Indian Island is a small island strategically located in Puget Sound near the towns of Port Hadlock and Port Townsend, Washington. The island is used to store and transship munitions, weapons, weapon components, and explosives for the Navy, U.S. Joint Forces, Department of Homeland Security, and other federal agencies and allied forces. The Navy is responsible for all operations on NMII.

Magazine management and safety operations are conducted pursuant to a Navy manual entitled *Ammunition and Explosives Ashore Safety Regulations for Handling, Storing, and Production Renovation and Shipping* ("OP-5 manual"). Though the Navy considers the OP-5 manual to be restricted information, Milner managed to purchase one section of the manual on the Internet. The portion of the OP-5 manual in the record of this case states:

> The purpose of this volume is to acquaint personnel engaged in operations involving ammunition, explosives, and other hazardous materials, and to prescribe standardized safety regulations for the production, renovation, care, handling, storage, preparation for shipment, and disposal of these items.

The OP-5 manual also calls for development of technical drawings and specifications, which "should be consulted for additional, detailed requirements."

The technical information developed pursuant to the OP-5 manual includes Explosive Safety Quantity Distance ("ESQD") data. The ESQD calculations measure the effects of an explosion at a particular location. The information is expressed either as a mathematical formula or as an arc map, where the center of the arc is the source of an explosion and the arc's periphery is the maximum area over which the force of the explosion would reach. The Navy uses this information to design and construct NMII ammunition storage facilities in compliance with the safety guidelines spelled out in OP-5. The ESQD arcs indicate the maximum amounts of explosives that should be stored in any one storage facility, and minimum distances that various explosives should be stored from one another. This aids the Navy in storing ordnance in such a way that the risk of chain reactions, or "sympathetic detonations," is minimized if one storage facility suffers an attack or accident. The ESQD arcs are "designed to be a long term planning tool for the Navy."

Milner is a Puget Sound resident and a member of the Ground Zero Center for Nonviolent Action, an organization dedicated to raising community awareness of the dangers of the Navy's activities. On December 7, 2003, and January 29, 2004, he submitted two FOIA requests to the Navy.[1] He requested three types of documents:

> 1. [A]ll documents on file regarding [ESQD] arcs or explosive handling zones at the ammunition depot at Indian Island. This would include all documents showing impacts or potential impacts of activities in

---

[1]The district court found Milner's two requests "substantially identical" and treated them as a single FOIA request. We agree with the district court's assessment.

the explosive handling zones to the ammunition depot and the surrounding areas;

2. [A]ll maps and diagrams of the ammunition depot at Indian Island which show ESQD arcs or explosive handling zones; and

3. [D]ocuments regarding any safety instructions or operating procedures for Navy or civilian maritime traffic within or near the explosive handling zones or ESQD arcs at the ammunition depot at Indian Island.

The Navy identified 17 document packages totaling about 1,000 pages that met these parameters. The Navy compiled a thorough index of the relevant documents and disclosed most of them to Milner. It withheld only 81 documents, claiming that their disclosure could threaten the security of NMII and the surrounding community.

Milner filed suit under FOIA to compel disclosure of the remaining documents related to ESQD information. Commander George Whitbred, Commanding Officer of NMII, and other officers filed detailed affidavits discussing the nature and uses of the ESQD information. The commander's affidavit specified his concern that the information, if disclosed, could be used to plan an attack or disrupt operations on NMII. Both parties moved for summary judgment. The Navy argued the documents were exempt from disclosure under 5 U.S.C. §§ 552(b)(2) ("Exemption 2") and (b)(7)(f) ("Exemption 7"). The district court granted summary judgment in favor of the Navy under Exemption 2. *Milner v. U.S. Dep't of Navy*, No. C06-1301-JCC, 2007 WL 3228049 (W.D. Wash. Oct. 30, 2007). It did not reach the question whether the documents would also be exempt under Exemption 7. Milner timely appealed.

## II

We apply a two-step standard of review to summary judgment in FOIA cases. "The court first determines under a *de*

*novo* standard whether an adequate factual basis exists to support the district court's decisions. If an adequate factual basis exists, then the district court's conclusions of fact are reviewed for clear error, while legal rulings, including its decision that a particular exemption applies, are reviewed *de novo*." *Lane v. Dep't of Interior*, 523 F.3d 1128, 1135 (9th Cir. 2008) (internal citations omitted). Both parties agree that an adequate factual basis exists to support the district court's decision. They dispute only the applicability of the exemptions from disclosure.

An agency bears the burden of proving it may withhold documents under a FOIA exemption. 5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). It may meet this burden by submitting affidavits showing that the information falls within the claimed exemption. *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996). "In evaluating a claim for exemption, a district court must accord substantial weight to [agency] affidavits, provided the justifications for nondisclosure are not controverted by contrary evidence in the record or by evidence of [agency] bad faith." *Id.* (internal quotations omitted).

## III

### A

**[1]** FOIA reflects "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360-61 (1976) (quoting S. Rep. No. 813-89, at 3 (1965)). An agency may withhold a document, or portions thereof, only if the material falls into one of the nine statutory exemptions delineated by Congress in § 552(b). *Id.* at 361. These nine exemptions are "explicitly exclusive." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (quoting *FAA Adm'r v. Robertson*, 422 U.S. 255, 262 (1975)). The delineated exemptions "are to be interpreted narrowly." *Lahr*

*v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009) (quotation omitted).

[2] Our concern in this case is the scope of Exemption 2. That section exempts from disclosure matters that are "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). There are two categories of information that may fall within Exemption 2's ambit—"Low 2" and "High 2." Low 2 materials include rules and practices regarding mundane employment matters such as parking facilities, lunch hours, and sick leave, which are not of "genuine and significant public interest." *See Rose*, 425 U.S. at 363 (citing S. Rep. No. 813-89, at 8 (1965)); *id.* at 369; *Hardy v. Bureau of Alcohol, Tobacco & Firearms*, 631 F.2d 653, 655 (9th Cir. 1980).

[3] The High 2 exemption protects more sensitive government information.[2] This category applies to "internal personnel rules and practices," disclosure of which "may risk circumvention of agency regulation." *Rose*, 425 U.S. at 369; *see, e.g.*, *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992) (holding an agency's litigation strategy "does qualify as 'high 2' material because its disclosure would risk circumvention of statutes or agency regulations"). Only the High 2 category is at issue here.

## B

[4] Information may be exempted as High 2 if it (1) fits within the statutory language and (2) would present a risk of circumvention if disclosed. *See Morley v. CIA*, 508 F.3d 1108,

---

[2]This category developed from Rose, in which the Supreme Court held that Air Force disciplinary studies were not exempt from disclosure because they were a matter of genuine and significant public interest. 425 U.S. at 364-70. However, the Court explicitly left open the question whether Exemption 2 would cover situations "where disclosure may risk circumvention of agency regulation." *Id.* at 369.

1124 (D.C. Cir. 2007) (citing *Schwaner v. Dep't of Air Force*, 898 F.2d 793, 794 (D.C. Cir. 1990)). The essential question in this case is what standard we employ to determine whether the requested information relates sufficiently to the "internal personnel rules and practices" of the agency, as required by the statute. The Navy argues we should apply the "predominantly internal" standard employed by the D.C. Circuit. Milner argues our prior caselaw forecloses this approach, and that our inquiry is limited to whether the information at issue is "law enforcement material."

**[5]** In *Hardy v. Bureau of Alcohol, Tobacco & Firearms*, we addressed the question of circumvention left open in *Rose*. 631 F.2d at 656. We considered FOIA requests for the ATF's *Raids and Searches* manual. We joined the Second Circuit in holding that "law enforcement materials, the disclosure of which may risk circumvention of agency regulation, are exempt under Exemption 2." *Id.* (citing *Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544 (2d Cir. 1978)). *Hardy* concluded that the instructions contained in the manual "concern[ed] internal personnel practices" and were therefore exempt from disclosure under Exemption 2. *Id.*

**[6]** Following our decision in *Hardy*, the D.C. Circuit decided *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C. Cir. 1981) (en banc). Like the plaintiff in *Hardy*, the plaintiff in *Crooker* sought disclosure of portions of the same ATF raid manual. Our sister circuit noted that the materials sought were "law enforcement" in nature, but went on to formulate a "predominantly internal" standard to determine which personnel materials could be withheld under Exemption 2. *Id.* at 1072-74.

**[7]** The D.C. Circuit undertook an extensive analysis of FOIA's structure and legislative history, its underlying policy, and the applicable caselaw. It concluded that "the words 'personnel rules and practices' encompass not merely minor employment matters, but may cover other rules and practices

governing agency personnel, including significant matters like job training for law enforcement personnel." *Id.* at 1056. To balance the competing implications of the words "related" and "solely," the court settled on the modifier "predominantly."[3] *Id.* at 1056-57; *see Schwaner*, 898 F.2d at 795. The court ultimately determined that documents related to personnel rules and practices should be exempt when the materials are "predominantly internal."

[8] The Navy argues that the Ninth Circuit's caselaw post-*Hardy* has essentially adopted this standard, or, in the alternative, that we should do so explicitly. The district court granted summary judgment on this ground, reasoning that our cases take such a broad view of the term "law enforcement" that "the test they embody bears more than a passing resemblance" to the D.C. Circuit's "predominantly internal" standard. *Milner*, 2007 WL 3228049 at *7. We agree that Exemption 2 is not limited to "law enforcement" materials, and now take the opportunity to formally endorse the D.C. Circuit's analysis, as set forth in *Crooker*. We hold that Exemption 2 shields those personnel materials which are predominantly internal and disclosure of which would present a risk of circumvention of agency regulation.

Our existing caselaw is consistent with the D.C. Circuit's approach. *Hardy* held that "law enforcement materials, the disclosure of which may risk circumvention of agency regulation, are exempt under Exemption 2." 631 F.2d at 656. It did not hold that *only* law enforcement materials are exempt

---

[3]The court relied on Judge Leventhal's analysis in a prior case:

> [P]ushed to their logical ends, "relating" is potentially all-encompassing while "solely" is potentially all-excluding. It seems unlikely that Congress intended either extreme, and that "solely" in this context has to be given the construction, consonant with reasonableness, of "predominantly."

*Crooker*, 670 F.2d at 1056-57 (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1150-51 (D.C. Cir. 1975) (Leventhal, J., concurring)).

under Exemption 2. The shorthand descriptor "law enforcement materials" was apt in *Hardy* because the case concerned policies and procedures for executing search warrants. The *Crooker* court apparently understood that *Hardy* addressed law enforcement materials but did not limit Exemption 2 to such information, relying on *Hardy* without adopting or even considering the use of "law enforcement" as a generally applicable standard. 670 F.2d at 72. The *Crooker* court, like the Second Circuit in *Caplan* and our panel in *Hardy*, used "law enforcement" to describe the materials at issue. *Id.* at 1056, 1057. It went on to determine that the manuals were "predominantly internal" and that their disclosure "significantly risks circumvention of the federal statutes or regulations." *Id.* at 1073-75.

**[9]** *Maricopa Audubon Society v. United States Forest Service*, 108 F.3d 1082 (9th Cir. 1997), our most recent case examining Exemption 2, also treated the "law enforcement" test as merely one way to meet Exemption 2's requirements. *Maricopa* first held generally that goshawk nesting site data does not "relate 'solely,' or even predominantly, 'to the internal personnel rules and practices of an agency.' " *Id.* at 1085 (quoting 5 U.S.C. § 552(b)(2)). It relied heavily on cases from the Tenth and D.C. Circuits, both of which cited *Crooker*. *Id.* at 1085-86; *see Audubon Soc. v. U.S. Forest Serv.*, 104 F.3d 1201, 1203-04 (10th Cir. 1997); *Schwaner*, 898 F.2d at 794. Only then did *Maricopa* proceed to consider, and reject, the more specific argument that the nest site data was exempt because it was "law enforcement" material. 108 F.3d at 1086-87. In sum, the instructive cases on Exemption 2 do not limit the class of exempt information to "law enforcement" materials alone. Therefore, finding information to be "law enforcement" material is a sufficient, but not necessary, condition to exemption under Exemption 2.

**[10]** We adopt the "predominantly internal" standard for several reasons. First, limiting Exemption 2 to "law enforcement" materials has no basis in either Supreme Court prece-

dent or the statute. The Supreme Court in *Rose* does not use the phrase except in a footnote relating to a different FOIA exemption. Nor does the phrase "law enforcement" appear in the text of § 552(b)(2), which exempts matters "related solely to the internal personnel rules and practices of an agency." A proper standard would combine Congress's requirement that the material be related to "internal personnel rules and practices" and the Supreme Court's focus on the risk of circumvention of the law. *Crooker*'s standard properly reflects both.

As a matter of statutory interpretation, a definition of "internal personnel rules and practices" that rests solely on whether the information is "law enforcement" material makes little sense in light of the entire list of FOIA exemptions. "Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991).

First, other provisions of FOIA indicate Congress was concerned with the disclosure of sensitive materials. Such materials will usually be, by their nature, predominantly internal. Exemption 1 covers information with a particular legal status —classified information. 5 U.S.C. § 552(b)(1). Exemptions 7(e) and (f) exempt law enforcement materials that, if disclosed, would risk circumvention of the law or place individuals in danger. *Id.* § 552(b)(7). These exemptions reflect a concern that much of an agency's internal information could be used by individuals with ill intent. It would be incongruent if FOIA protected sensitive information when it is contained in a classified or law enforcement document, but not when it is contained in a document developed predominantly for use by agency personnel. *Cf. Crooker*, 670 F.2d at 1065 ("It would be inconsistent to no small degree to hold that Exemption 2 would not bar the disclosure of investigatory techniques when contained in a manual restricted to internal use, but that

Exemption 7(E) would exempt the release of such techniques if contained in an 'investigatory record.' ").

Second, Exemption 7 protects "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). If Exemption 2 also covers *only* "law enforcement" materials, Exemption 7 is redundant. *See, e.g.*, *Gordon v. FBI*, 388 F. Supp. 2d 1028, 1036 (N.D. Cal. 2005) (discussing Exemptions 2 and 7 together, applying the same standards and reasoning to both). Moreover, Exemption 7 contains meaningful limitations on the use of law enforcement materials which are not present in Exemption 2. Exemption 7 protects "records or information compiled for law enforcement purposes," but only in certain situations, such as when disclosure would be expected to interfere with enforcement proceedings, deprive someone of a fair trial, or expose a confidential source. 5 U.S.C. § 552(b)(7). Applying a general "law enforcement materials" test under Exemption 2 renders meaningless the conditions that Congress has placed on non-disclosure of law enforcement materials under Exemption 7.

Congress has impliedly approved of *Crooker*'s approach. The Freedom of Information Reform Act of 1986, Pub. L. No. 99-570, subtit. N, 100 Stat. 3207, 3207-48 (1986), codified part of *Crooker* into Exemption 7. The legislative history of the Reform Act expressly states that the amended Exemption 7 was modeled after "the 'circumvention of the law' standard that the D.C. Circuit established in its en banc decision in *Crooker v. BATF*, 670 F.2d 1051 (D.C. Cir. 1981) (en banc) (interpreting Exemption 2)." S. Rep. No. 221-98, at 25 (1983). As the Seventh Circuit concluded in *Kaganove v. EPA*, "[b]ecause Congress saw fit to codify the very language of *Crooker*, and because nothing in the legislative history of the Reform Act suggests the slightest disagreement with that case's holding, we believe that *Crooker* accurately expresses congressional intentions." 856 F.2d 884, 889 (7th Cir. 1988)*, cert. denied*, 488 U.S. 1011 (1989). Though this statutory history is not dispositive, it is certainly illustrative.

Finally, we note two practical considerations that favor adoption of the "predominantly internal" test. First, narrowing Exemption 2 to only "law enforcement" materials forces our courts to strain the term "law enforcement." *See, e.g.*, *Dirksen v. U.S. Dep't of Health and Human Servs.*, 803 F.2d 1456, 1459, 1461 (9th Cir. 1986) (Ferguson, J., dissenting) (accusing the panel majority of "judicial legislation" and "expand[ing] the concept of law enforcement" in holding that Medicare payment processing guidelines were "law enforcement" materials). *Hardy* did not define "law enforcement" and plainly contemplated a broad understanding of the term. 631 F.2d at 657 ("'Law enforcement' materials involve methods of enforcing the laws, *however interpreted* . . . ." (emphasis added)). Yet the term "law enforcement" must have some meaning and limit. *See Maricopa*, 108 F.3d at 1087 ("[N]o common-sense definition of the term suggests that goshawk nest-site information can be deemed 'law enforcement material' "). *Maricopa* carefully applied *Hardy* and suggested the limits of the term: whether the information "tell[s] the [agency] how to catch lawbreakers; [or tells] lawbreakers how to avoid the [agency's] enforcement efforts." *Id.*

Our existing cases lead our district courts to strain the logical limits of "law enforcement" to cover otherwise valid invocations of Exemption 2. They regularly deny requests for disclosure of all kinds of internal documents, including those related to the military and national security, even if unrelated to investigations or prosecutions. *See, e.g.*, *Kelly v. FAA*, No. 07-00634, 2008 WL 958037 (E.D. Cal. Apr. 8, 2008) (magistrate judge recommending exemption of "grading sheet" for hiring of Designated Pilot Examiners); *L.A. Times v. Dep't of Army*, 442 F. Supp. 2d 880, 898 (C.D. Cal. 2006) (holding data on insurgent and other attacks in Iraq are "law enforcement materials"); *Gordon*, 388 F. Supp. 2d at 1036 (holding "no fly" and other aviation watch lists are "law enforcement materials"); *Coastal Delivery Corp. v. U.S. Customs Serv.*, 272 F. Supp. 2d 958, 965 (C.D. Cal. 2003) (examining both *Hardy* and *Crooker* and holding data on the number of Cus-

toms inspections at a particular port constitute "law enforcement material"). If judges must regularly labor to apply the standard in order to fit their intuitive understanding of congressional intent, there is something wrong with the standard.

Our second practical concern stems from a preference for national uniformity. *Crooker* has become the authoritative case on Exemption 2. It presents an extraordinarily comprehensive analysis of the statutory language, legislative history, and caselaw. At least four of our sister circuits have adopted or relied on *Crooker*. *See Abraham & Rose, PLC v. United States*, 138 F.3d 1075, 1080 (6th Cir. 1998); *Audubon Soc.*, 104 F.3d at 1204; *Massey v. FBI*, 3 F.3d 620, 622 (2d Cir. 1993); *Kaganove*, 856 F.2d at 889. Bringing our circuit into alignment with the D.C. Circuit would create a more uniform standard for national agencies like the U.S. Navy. It would also allow our district courts to seek guidance from the D.C. Circuit's extensive case law in applying Exemption 2, in the absence of authoritative Ninth Circuit or Supreme Court rulings.

**[11]** In short, FOIA "resolved two crucial but potentially conflicting interests: the right of the citizenry to know what the Government is doing, and the legitimate but limited need for secrecy to maintain effective operation of Government." *Crooker*, 670 F.2d at 1062. The text and history of Exemption 2 indicate that Congress intended to prevent disclosure of personnel matters that are predominantly internal, regardless of whether they are "law enforcement" in nature. Limiting Exemption 2 to "law enforcement materials" would frustrate that policy while rendering Exemption 7 almost entirely superfluous. Adopting the "predominantly internal" standard gives due respect to Congress's policy choices. It also simplifies our approach to Exemption 2 and brings us into alignment with some of our sister circuits.

**[12]** Therefore, we hold that a personnel document is exempt as "High 2" if it is predominantly internal and its dis-

closure presents a risk of circumvention of agency regulation. Law enforcement materials, as defined in *Hardy* and *Maricopa*, satisfy these criteria. However, other sorts of materials —such as Navy data used for internal planning and safety purposes—may also meet the standard for exemption under Exemption 2. We now turn to the question of whether the ESQD information requested here satisfies these criteria.

## IV

## A

**[13]** We first consider whether the ESQD arcs fit within the statutory language— that is, whether they are "predominantly internal" personnel rules or practices. The ESQD arcs at issue here are essentially an extension of the OP-5 manual, which governs operations on NMII. As noted above, the Foreword to the manual states that "[t]he purpose of this volume is to acquaint personnel engaged in operations" involving explosives with the relevant procedures. The Foreword further states that "[t]he instructions and regulations prescribed in [the] OP-5 [manual] . . . are considered minimum criteria. The specific items, technical manuals, drawings, and specifications referenced in this publication should be consulted for additional, detailed requirements." ESQD arcs are one of the "specific items" referenced in the OP-5 manual. Therefore, the ESQD arcs constitute one part of the internal policies and procedures that NMII personnel are bound to follow when handling and storing explosive ordnance.

**[14]** Our understanding comports with the Navy's declarations that ESQD arcs are used by its personnel to "design, array, and construct ammunition storage facilities, and to organize ammunitions operations for risk mitigation and enhanced safety"—the very subjects of the OP-5 personnel manual. The ESQD data is indeed an integral part of the Navy's personnel practices. Like the ATF raid manual at issue in *Hardy* and *Crooker*, the information sought here is predom-

inantly used for the internal purpose of instructing agency personnel on how to do their jobs.

Milner and the dissent suggest that the Navy should classify this information in order to keep it internal. However, not all internal information can be classified, for legitimate reasons of personal and national security. Classifying such information may present logistical challenges that could actually impede safe and effective operations. For instance, the Navy has occasionally shared ESQD information with civilian first responders around Port Townsend whose fire, rescue, and police services would be needed in the event of an accident or attack on NMII.

Milner further argues the decision to share the information with local officials means the information is not "internal." We disagree. The decision to share otherwise internal information with emergency responders does not necessarily place the information outside the bounds of Exemption 2. First, we do not wish to discourage agencies from sharing internal information with local first responders. Such cooperation encourages coordinated and effective mutual aid that improves safety for both government employees and citizens. Agencies must be permitted to grant limited, confidential access to other federal and local agencies without risking broader disclosure. Second, limited disclosure for official purposes does not violate the standard that information must be "*predominantly* internal." Of course, if an agency regularly and publicly discloses its practices, it can no longer claim the information is predominantly internal. That is not the case here. The ESQD arcs are "predominantly internal," regardless of prior limited disclosure to local officials.

Finally, FOIA's fundamental concern with the existence of "secret law" is not implicated here. *See Hardy*, 631 F.2d at 657 (stating that administrative materials, which "involve the definition of the violation and the procedures required to prosecute the offense, . . . contain the 'secret law' which was the

primary target of [FOIA's] broad disclosure provisions"). When internal personnel practices are used as "a source of 'secret law,' as important to the regulation of public behavior as if they had been codified," we cannot say the information is predominantly internal. *Crooker*, 670 F.2d at 1075 (discussing the guidelines for prosecutorial discretion at issue in *Scott v. United States*, 419 F.2d 264, 277 (D.C. Cir. 1969)); *Hardy*, 631 F.2d at 657. Even if the information sought was developed for purely internal uses, we could not permit invocation of Exemption 2 if the information had external legal effect.

[15] In this case, the personnel procedures derived from ESQD arcs are certainly not written to regulate the public. The ESQD arcs have absolutely no legal or enforcement ramifications whatsoever on the citizens of the Puget Sound region. Nothing about the data even *could* be codified in any logical way to regulate public behavior, and the Navy has not attempted to do so. We therefore hold the requested ESQD information is "predominantly internal."[4]

## B

We next turn to the question whether disclosure of the ESQD information "may risk circumvention of agency regulation." Rose, 425 U.S. at 369; *see Crooker*, 670 F.2d at 1070 (exempting ATF raid manual because disclosure risked "circumvention of the law"). In *Rose*, the Supreme Court surveyed the House and Senate reports related to Exemption 2 in considering the scope of the exemption. 425 U.S. at 362-67.[5] The Court noted the House Report's emphasis on preventing circumvention of agency regulation and discussed prior cases relying on this Report:

---

[4]The dissent does not dispute that the requested materials satisfy Exemption 2's "predominantly internal" requirement.

[5]The Court ultimately chose to rely on the Senate Report in determining Congress' intent in resolving the question at issue in *Rose*. 425 U.S. at 367.

> Those cases relying on the House, rather than the Senate, interpretation of Exemption 2, and permitting agency withholding of matters of some public interest, have done so only where necessary to prevent the circumvention of agency regulations that might result from disclosure to the subjects of regulation of the procedural manuals and guidelines used by the agency in discharging its regulatory function.

*Id.* at 364. However, because *Rose* was not a case "where knowledge of administrative procedures might help outsiders to circumvent regulations or standards," *id.* (quotation omitted), the Court left open the question whether Exemption 2 would apply "where disclosure may risk circumvention of agency regulation," *id.* at 369.

Building on this framework, *Crooker* addressed the general question whether "Exemption 2 might be construed to cover internal agency materials where disclosure might risk circumvention of the law." 670 F.2d at 1067. It concluded, "we hold that . . . if disclosure significantly risks circumvention of agency regulations or statutes, then Exemption 2 exempts the material from mandatory disclosure." *Id.* at 1074. Five years later, the D.C. Circuit again summarized the scope of the circumvention requirement:

> [W]e have not limited the "high 2" exemption to situations where penal or enforcement statutes could be circumvented. Rather, we have held that "[w]here disclosure of a particular set of documents would render those documents operationally useless, the *Crooker* analysis is satisfied whether or not the agency identifies a specific statute or regulation threatened by disclosure."

*Schiller*, 964 F.2d at 1208 (quoting *Nat'l Treasury Employees Union v. U.S. Customs Serv.*, 802 F.2d 525, 530-31 (D.C. Cir. 1986)).

**[16]** In cases following *Crooker*, courts have exempted information that would aid individuals in thwarting various kinds of rules, procedures, and statutes.[6] *See Massey*, 3 F.3d at 622 (exempting "redact[ed] internal FBI notations containing the name of an FBI agent, the initials of other FBI employees, and certain administrative markings"); *PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993) (exempting "specific documents, records and sources of information available to Agents investigating obscenity violations" because "release of FBI guidelines as to what sources of information are available to its agents might encourage violators to tamper with those sources of information"); *Schiller*, 964 F.2d at 1208 (exempting documents containing the National Labor Relations Board's litigation strategies in Equal Access to Justice Actions); *Kaganove*, 856 F.2d at 889-890 (exempting EPA document used to rate job candidates); *Dirksen*, 803 F.2d at 1458-59 (exempting guidelines used for processing Medicare payment claims); *Nat'l Treasury Employees Union*, 802 F.2d at 530-31 (exempting "crediting plans" used to evaluate job applicants); *Founding Church of Scientology v. Smith*, 721 F.2d 828, 829, 831 (D.C. Cir. 1983) (affirming district court's judgment that disclosure of "administrative handling instructions" "would risk circumvention of federal statutes").

---

[6]The dissent refers to "a consistent line of cases in which agency maps have been held not to qualify under Exemption 2." Dissent at 10381. We concede that the maps at issue in the cited cases were deemed non-exempt. However, the fact that the information at issue was expressed in the form of a map is utterly irrelevant to our analysis. A map may or may not meet the standard for Exemption 2; it will depend, in each case, on what information the map conveys and the purpose for which it is used. Even under the dissent's narrow reading of the circumvention requirement, a map might well facilitate circumvention by a regulated person or entity. For instance, a map or diagram showing the location of cameras in a prison would be of great interest to an inmate who wishes to avoid detection when he violates prison regulations. We decline to draw distinctions based on whether the information appears in images, numbers, words, or any other format.

**[17]** The record before us reveals that the ESQD information falls squarely within this class of cases. An agency must "submit to the district court a detailed affidavit describing how disclosure would risk circumvention of agency regulation." *Hardy*, 631 F.2d at 657 (relying on *Cuneo v. Schlesinger*, 484 F.2d 1086, 1092 (D.C. Cir. 1973)). "If the explanation is reasonable, the district court should find the materials exempt from disclosure, unless in camera examination shows that they contain secret law or that the agency has not fairly described the contents in its affidavit." *Id.* (citing *Cox v. U.S. Dep't of Justice*, 576 F.2d 1302, 1311-12 (8th Cir. 1978)).

**[18]** The Navy has described in detailed affidavits precisely how public disclosure would risk circumvention of the law—the ESQD arcs sought here point out the best targets for those bent on wreaking havoc. The arcs indicate specific blast ranges for individual magazines within NMII. A terrorist who wished to hit the most damaging target or a protestor who wished to disrupt the Navy's monitoring and transportation protocols would be greatly aided by such information.[7] The dissent does not apparently dispute that this risk exists; it concludes only that risking sabotage of military explosives is not the sort of "circumvention of the law" that should concern us.

**[19]** As in *National Treasury Employees Union*, disclosure of the ESQD data "would quickly render those documents obsolete for the purpose for which they were designed." 802 F.2d at 530. The ESQD arcs are created as a planning tool to prevent catastrophic detonations; disclosing the arcs would make catastrophe more likely. The fact that requests for similar information from the Bangor nuclear submarine base have

---

[7]Milner's argument that such acts of sabotage are already criminalized is unavailing. The same is equally true for misdeeds involving drugs and firearms, but *Hardy* and *Crooker* nonetheless concluded that criminals should not have the benefit of inside information in frustrating an ATF raid. *Hardy*, 631 F.2d at 656; *Crooker*, 670 F.2d at 1073.

been granted is irrelevant to our analysis. "[T]he release of certain documents waives FOIA exemptions *only for those documents released.*" *Mobil Oil Corp. v. EPA*, 879 F.2d 698, 701 (9th Cir. 1989). Moreover, Commander Whitbred explicitly addressed this argument in his affidavit: "[NMII] is not a submarine base. The nature of its mission is completely different, as are its security parameters, and physical characteristics. Furthermore, [NMII] is not a single-weapon system facility such as the bases referenced where the risks are associated with a single program." Because the Navy's safety concern rests on the potential utility of the ESQD arcs in identifying the most hazardous target among many, these distinctions are significant. *Hardy* and *Minier* instruct us to accord substantial weight to these reasonable explanations. *Hardy*, 631 F.2d at 657; *Minier*, 88 F.3d at 800.

**[20]** The Navy released roughly 1,000 documents responsive to Milner's requests. It withheld the narrow class of documents at issue here because, as Commander Whitbred put it, "I believe *strongly* that release of the sensitive ESQD information involved in this case would jeopardize the safety and security of the storage, transportation, and loading of ammunitions and explosives" (emphasis original). There is no basis to "suspect" that the Navy has ulterior, political motives for denying the requested information. *See* Dissent at 10385. The Navy has met its burden of describing how disclosure would risk circumvention of its regulations. Therefore, the district court properly exempted the requested ESQD information from disclosure.[8]

## V

In conclusion, we reiterate our approach to Exemption 2. First, the material withheld must fall within the terms of the

---

[8]Because we conclude the requested information was properly exempted under Exemption 2, we need not reach the alternative argument that Exemption 7 also applies.

statutory language. To determine whether a personnel document falls within the statutory language, we inquire whether it is "predominantly internal." Law enforcement material, as defined in *Hardy* and *Maricopa*, qualifies as predominantly internal, but it is not the only category of materials that may meet this test. Second, if the material is predominantly internal, the agency may defeat disclosure by proving that disclosure may risk circumvention of the law. The ESQD arcs requested here are predominantly internal personnel materials, and if disclosed would present a serious risk of circumvention of the law. The district court properly ruled that the information sought is exempt from FOIA disclosure.

**AFFIRMED.**

---

W. FLETCHER, Circuit Judge, dissenting:

The question in this case is whether Explosive Safety Quantity Distance ("ESQD") arc maps are exempt from disclosure under the Freedom of Information Act ("FOIA"). The Navy claims the maps are exempt under FOIA Exemption 2 and Exemption 7(F). Exemption 2 covers information "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). Exemption 7(F) covers "records or information compiled for law enforcement purposes" that, if disclosed, "could reasonably be expected to endanger the life or physical safety of any individual." *Id.* § 552(b)(7)(F). The majority holds that ESQD maps are exempt under Exemption 2. It does not reach Exemption 7(F).

The majority's holding is inconsistent with both the statute and the uniform case law interpreting Exemption 2. I would hold that the ESQD maps are not exempt under either FOIA Exemption 2 or Exemption 7(F).

## I.   Background

Naval Magazine Indian Island ("NMII") is an ordnance storage depot located on the northwest side of Indian Island on Port Townsend Bay in Washington State. The bay is on the northeast corner of the Olympic Peninsula, where the Straits of Juan de Fuca come in from the Pacific Ocean to meet Puget Sound. The bay is used by many kinds of pleasure and work boats. The northern part of NMII is a little more than two miles southeast of the town of Port Townsend across the open water of the bay, and several hundred feet west of Fort Flagler State Park on nearby Marrowstone Island. The southern part of NMII is a little more than a mile east of the towns of Port Hadlock and Irondale across the open water of the bay. NMII is used to store and transship ammunition, weapons, weapon components and explosives for the Navy, U.S. Joint Forces, Homeland Security and other federal agencies and allied forces. The Navy is responsible for all operations on NMII.

Glen Scott Milner is a life-long resident of the Puget Sound region. For the past twenty years he has done research and written about explosive hazards related to Navy activities in Puget Sound. He has published articles in the Bulletin of Atomic Scientists, BASIC (British American Security Information Council, in London), Seattle Times, Seattle Post-Intelligencer, Kitsap Sun, Port Townsend Leader, Washington Free Press, and Real Change in Seattle. In addition, numerous radio and television shows and newspaper articles have featured his comments about local Navy activities or used information that he obtained through FOIA.

The Navy develops ESQD arc maps as part of its explosives safety program. On an arc map,[1] an hypothesized explosion is at the focus of the arc. The arc represents the distance

---

[1]When I refer to ESQD arc maps, I refer not only to the maps but to the mathematical calculations of which the maps are the graphic representation.

at which the force of the explosion will be felt. The distance between the site of the explosion and the arc varies depending on the kind and quantity of ordnance. ESQD arc maps are essentially safety maps, telling the Navy (and anyone else who is allowed to see them) not only where different kinds and quantities of ordnance should be stored, but also how far away people and structures should be located to ensure their safety in the event of an explosion.

Milner submitted two FOIA requests to the Navy, one on December 7, 2003, and the other on February 3, 2004, for information about explosion hazards at NMII. The district court found Milner's two requests "substantially identical" and treated them as a single FOIA request. Milner requested three kinds of documents:

> [1] [A]ll documents on file regarding ESQD arcs or explosive handling zones at the ammunition depot at Indian Island. This would include all documents showing impacts or potential impacts of activities in the explosive handling zones to the ammunition depot and the surrounding areas[;] . . .

> [2] all maps and diagrams of the ammunition depot at Indian Island which show ESQD arcs or explosive handling zones"[;] [and]

> [3] documents regarding any safety instructions or operating procedures for Navy or civilian maritime traffic within or near the explosive handling zones or ESQD arcs at the ammunition depot at Indian Island.

The Navy identified seventeen document packages totaling about 1,000 pages that met Milner's request. The Navy disclosed most of these documents to Milner, but withheld 81 documents, claiming that their disclosure could threaten the security of NMII and the surrounding community.

Jefferson County Commissioner Phil Johnson states in a declaration that he wrote two letters to Rear Admiral W.D. French requesting a meeting between Navy officials and the general public concerning safety of ordnance storage and handling at NMII. Jefferson County encompasses the towns of Port Townsend, Port Hadlock and Irondale. In his first letter, dated February 21, 2006, Commissioner Johnson recounted that Captain Kurtz, the then-Commanding Officer of NMII, and his staff had provided a tour of NMII to "local governmental leaders and the press." He wrote, "The three hours that we spent touring the facilities and listening to the presentations about the Magazine's safety record, the 'standard operating procedures' and the Navy's environmental program were indeed impressive." Commissioner Johnson then proposed a discussion lasting one to two hours at Fort Worden State Park "with our general public, Captain Kurtz and his staff," and with a "neutral facilitator who will keep the audience focused on the purpose of the meeting." Admiral French wrote back thanking Commissioner Johnson for his "support of the U.S. Navy," stating that "the Navy values its outstanding relationship with Jefferson County," and describing meetings Captain Kurtz had had with different groups, including the Chambers of Commerce of Port Hadlock and Port Townsend. However, Admiral French did not mention Commissioner Johnson's proposal for a general public meeting.

In a second letter to Admiral French, dated April 3, 2006, Commissioner Johnson again requested a general public meeting. This time he proposed that an "open public forum" be held at the Jefferson County Courthouse. He proposed that Captain Kurtz and his staff appear on a panel with "panelists from the Hospital, Emergency Operations and Law Enforcement/Fire." He again proposed that there be a "neutral moderator, who we will provide, to insure that the forum remains focused on NAV MAG Indian Island and the plans for the island." This time, Admiral French responded to Commissioner Johnson's proposal. He declined, writing on May 3, 2006:

> Thank you for your letter . . . in which you pro-
> pose that a public forum be held . . . with presenta-
> tions by the Navy, the local hospital, your
> Emergency Operations Department, Law Enforce-
> ment and the East Jefferson Fire District. While we
> appreciate this opportunity and desire to keep the
> lines of communication open, we prefer to continue
> our current outreach program.

Admiral French listed occasions on which Captain Kurtz had
spoken to "many community groups and civic organizations
in the Port Townsend area." He stated, "We believe that these
public engagements have been quite successful in providing
information to the citizens of Jefferson County."

On September 11, 2006, Milner sued the Navy under FOIA
seeking disclosure of the documents the Navy had refused to
provide in response to his FOIA request.

Commander George Whitbred IV, the current Commanding
Officer of NMII, states in a declaration filed in this suit that
ESQD arcs "define minimum separation distances for quanti-
ties of explosives based on required degrees of protection.
These separation distances are established to afford reason-
able safety to Department of Navy shore activities, and, to the
extent possible, protect adjacent public and private property."
Commander Whitbred states that "ESQD arcs can be 'reverse
engineered' with the right information," and that "some arcs
reveal more than others about the particular ammunition,
explosive or weapons system." He states that arc maps are
provided to civilian members of the public on a "case-by-case
basis." Commander Whitbred states further:

> We sometimes share ESQD information with "first
> responders" at both Jefferson County and the City of
> Port Townsend. However, ESQD information is not
> released to the general public if a determination is
> made that the release might pose a serious threat of

death or injury to any person — either inside or out-
side the installation boundaries.

Milner states in a declaration that the Navy submarine base
at Bangor, Washington, "handles much of the ammunition
that is sent to Indian Island. The ammunition is routed by rail-
cars and then sent by truck to Indian Island." He further states
that the Navy has voluntarily handed over to him, pursuant to
FOIA requests, comparable arc maps for ordnance stored at
the Bangor base. The Navy's behavior with respect to the arc
maps for the Bangor base contrasts sharply with its behavior
with respect to the arc maps for NMII, even though the same
type of ordnance is stored at both bases. Milner states:

> Numerous documents showing ESQD arcs and
> related information about the Bangor base, similar to
> the documents I requested for Indian Island, have
> been released to me through FOIA. One 1995 docu-
> ment . . . lists 33 different sites with ESQD arcs at
> Naval Base Kitsap-Bangor. The Net Explosives
> Weight at these sites is listed from 5,000 to 3.72 mil-
> lion pounds . . . . The document also contains a map
> showing ESQD arcs at Bangor. Numerous similar
> maps showing ESQD arcs at Bangor have been
> released to me in the past.

Bangor is the Puget Sound base for the Navy's Trident
nuclear submarines. The Bangor base is located on the north-
eastern shore of Hood Canal, a little less than 40 miles due
south of Port Townsend. Despite its name, Hood Canal is not
a canal; rather, it is a long narrow inlet of Puget Sound mostly
running north and south along the eastern edge of the Olym-
pic Peninsula. The nearest town to the Bangor base is Silver-
dale, four or five miles across land to the south.

The Navy has not contradicted Milner's statement about the
nature and quantity of ordnance at Bangor. Nor has it contra-
dicted his statement that it has voluntarily released to him

under FOIA numerous arc maps for the ordnance stored at the Bangor base. Though it undoubtedly could have done so, the Navy has not provided affidavits or declarations from anyone connected with the Bangor base. Commander Whitbred of NMII has provided the Navy's only response to Milner's statements about the Bangor base. He states in his declaration, "I am not an expert on Trident Submarines; nor do I know the reasons why information about ESQD arcs might have been released by those commands in the past."

Both parties moved for summary judgment. The Navy contended that the documents were protected from disclosure under FOIA Exemptions 2 and 7(F). The district court granted summary judgment to the Navy under Exemption 2. The court did not address Exemption 7(F). Milner timely appealed.

## II.    Discussion

I would hold that neither Exemption 2 nor Exemption 7(F) permits the Navy to withhold the requested ESQD arc maps.

## A.    FOIA

The goal of FOIA is "to open agency action to the light of public scrutiny." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772 (1989) (internal quotation omitted). FOIA revised § 3 of the Administrative Procedure Act ("APA"), which Congress had declared was "full of loopholes which allow agencies to deny legitimate information to the public." S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965) ("Senate Report"); *see also* H.R. Rep. No. 1497, 89th Cong., 2d Sess., 4 ("House Report") ("Section 3 of the [APA], though titled 'Public Information' and clearly intended for that purpose, has been used as an authority for withholding, rather than disclosing, information."). In the words of the Supreme Court, "Section 3 was generally recognized as falling far short of its disclosure goals and came to be looked upon more as a withholding statute than a disclo-

sure statute." *Dep't of Air Force v. Rose*, 425 U.S. 352, 360 (1976) *(quoting EPA v. Mink*, 410 U.S. 73, 79 (1973)).

FOIA mandates that government agencies disclose their records through three methods. 5 U.S.C. § 552(a). Section 552(a)(1) requires that agencies publish certain information in the Federal Register. Section 552(a)(2) requires that certain other types of material be made available for public inspection and copying. Section 552(a)(3), upon which Milner relies, requires disclosure of all other reasonably described records not already released under § 552(a)(1) or (a)(2).

Federal agencies may withhold requested documents only if they fall under one of the nine enumerated exemptions to mandatory disclosure under FOIA. Exemptions under FOIA "must be narrowly construed." *Rose*, 425 U.S. at 361. Exemptions under FOIA are also "explicitly exclusive." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (quoting *FAA Adm'r v. Robertson*, 422 U.S. 255, 262 (1975)). That is, we may not read additional exemptions into FOIA, no matter how desirable such exemptions might be in the view of the agency or the court. *See also Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7-8 (2001); *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1082, 1085 (9th Cir. 1997). The existence of these nine enumerated exemptions "do[es] not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Rose*, 425 U.S. at 361.

## B.   FOIA Exemption 2

FOIA Exemption 2 allows agencies to withhold "matters . . . related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The question before us is whether ESQD arc maps are "related solely to internal personnel rules and practices" within the meaning of Exemption 2. I would hold that they are not.

I agree with part of the majority's analysis. I agree that we should adopt the reasoning of the D.C. Circuit articulated in *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C. Cir. 1981) (en banc). I further agree that our circuit's three decisions dealing with Exemption 2 — *Hardy v. Bureau of Alcohol, Tobacco & Firearms*, 631 F.2d 653 (9th Cir. 1980)*; Dirksen v. United States Department of Health and Human Services*, 803 F.2d 1456 (9th Cir. 1986); and *Maricopa Audubon Society v. United States Forest Service*, 108 F.3d 1082 (9th Cir. 1997) — are not inconsistent with *Crooker*. Finally, I agree that under *Crooker*, documents must be "predominantly internal" and pertain to "personnel rules and practices of an agency" to qualify under Exemption 2.

However, I strongly disagree with the majority's application of the part of *Crooker* that deals with what it calls "the circumvention requirement." Maj. Op. at 10366. *Crooker* held that a predominantly internal document whose release might result in the circumvention of agency regulation is protected under Exemption 2. Circumvention of agency regulation has a precise, and restricted, meaning. *Crooker* and all subsequent cases have held that the circumvention must be by a person or entity that is subject to regulation by the agency in question.

*Crooker* carefully described the sort of circumvention of agency regulation that qualifies a document for exemption under Exemption 2. *Crooker* noted that the Supreme Court's opinion in *Rose* had left open the question whether documents that would permit circumvention of regulation were exempted by Exemption 2. *Crooker* answered the question*,* holding that such documents were exempted. It quoted from *Rose* to make clear the sort of circumvention at issue. First, the Court in *Rose* had referred to Exemption 2 as being potentially available

only where necessary to prevent the *circumvention of agency regulations* that might result from *disclo-*

*sure to the subjects of regulation* of the procedural manuals and guidelines used by the agency in discharging its regulatory function.

*Crooker*, 670 F.2d at 1066 (quoting *Rose*, 425 U.S. at 364) (emphasis altered). Second, the Court had noted that the primary focus of the House Report on Exemption 2 had been on "exemption of *disclosures that might enable the regulated to circumvent agency regulation*." *Crooker*, 670 F.2d at 1066 (quoting *Rose*, 425 U.S. at 366-67) (emphasis added). Thus, under *Crooker*, agency documents embodying "personnel rules and practices" are exempt under Exemption 2 only when they are "procedural manuals and guidelines used by the agency in discharging its regulatory function," and only when their disclosure "to the subjects of regulation" might result in the "circumvention of agency regulations." *Crooker*, 670 F.2d at 1066 (quoting *Rose*, 425 U.S. at 364).

Examples of documents whose release might result in circumvention of agency regulation by regulated persons or entities include "instructions to such government officials as investigators and bank examiners." *Crooker*, 670 F.2d at 1057. The documents we held exempt under Exemption 2 in *Hardy* and *Dirksen* are further examples of such documents. In *Hardy*, we held exempt under Exemption 2 a Bureau of Alcohol, Tobacco, and Firearms ("BATF") training manual whose disclosure risked circumvention of BATF regulation by parties subject to that regulation. In *Dirksen*, we held exempt under Exemption 2 a document containing Medicare processing Guidelines whose disclosure risked circumvention of agency reimbursement regulations by Medicare providers subject to Health and Human Services regulation. In *Hardy*, we emphasized that the BATF manual was a law enforcement manual, and in *Dirksen*, we analogized the Guidelines document to a law enforcement manual.

In a consistent line of cases decided after *Crooker*, the D.C. Circuit has restricted the application of Exemption 2 to docu-

ments whose release would permit the subjects of the agency's regulation to circumvent that regulation. In *National Treasury Employees Union v. United States Customs Service*, 802 F.2d 525 (D.C. Cir. 1986), the court held that the Customs Service could withhold "crediting plans" it used to evaluate job applicants. *Id.* at 531. The court determined that "release of the plans creates a significant risk that the Service's applicant evaluation program will be seriously compromised" because "advance knowledge of the plans by applicants would allow and induce at least some of them to embellish—or perhaps even fabricate—their backgrounds to suit the appropriate crediting plan." *Id.* at 529.

In *Schiller v. NLRB*, 964 F.2d 1205 (D.C. Cir. 1992), the court similarly allowed the National Labor Relations Board ("NLRB") to withhold documents containing the agency's litigation strategies in Equal Access to Justice Act ("EAJA") actions. *Id.* at 1207. The EAJA allows prevailing parties to recover attorney's fees and costs from the agency in certain circumstances. *See* 5 U.S.C. § 504. The court held that requiring the NLRB to disclose its litigation strategies would "compromis[e] the Board's ability to defend itself in EAJA actions." 964 F.2d at 1208.

In *PHE, Inc. v. United States Department of Justice*, 983 F.2d 248 (D.C. Cir. 1993), the court allowed the FBI to claim Exemption 2 for the section of its Manual of Investigative Operations and Guidelines related to interstate transportation of obscene matter. *Id.* at 251. This withheld section "detailed specific documents, records and sources of information available to Agents investigating obscenity violations, as well as the type of patterns of criminal activity to look for when investigating certain violations." *Id.* The court agreed with the government that the disclosure of this portion of the Manual would "provide[ ] violators with an opportunity to impede lawful investigations." *Id.*

The case law in other circuits is consistent with that of the D.C. Circuit. In *Caplan v. Bureau of Alcohol, Tobacco &*

*Firearms*, 587 F.2d 544 (2d Cir. 1978), the Second Circuit held exempt under Exemption 2 a BATF Raids and Searches training manual. *Id*. at 546. The court stated that releasing the manual would "significantly assist those engaged in criminal activity by acquainting them with the intimate details of the strategies employed in its detection." *Id*. at 547. The Seventh Circuit followed suit in *Kaganove v. EPA*, 856 F.2d 884 (7th Cir. 1988), holding exempt under Exemption 2 an EPA document used to rate job candidates. *Id*. at 889-90. The court found that disclosing the document would allow job applicants to exaggerate their credentials to receive higher ratings. *Id*. at 890.

The majority does not acknowledge the limited sense in which circumvention of agency regulation is used in the case law interpreting Exemption 2. The majority has cited no case — and can cite no case — in which Exemption 2 was applied more broadly than in the cases I have just described. In all of the reported cases dealing with the issue, Exemption 2 applies only to documents whose release would facilitate circumvention of agency regulation by a regulated person or entity. Under long-standing and well-established law, a document is protected under Exemption 2 only if its release risks circumvention *by a regulated person or entity*. Exemption 2 does not apply in this case because there is no such person or entity. The Navy is not acting as a regulatory or law enforcement agency, and the arc maps do not regulate anyone or anything outside the Navy itself.

The majority ignores a consistent line of cases in which agency maps have been held not to qualify under Exemption 2. Most important is our own case, *Maricopa Audubon Society v. United States Forest Service*, 108 F.3d 1082 (9th Cir. 1997), in which we held that Forest Service maps showing the locations of goshawk nests were not protected from disclosure under Exemption 2. 108 F.3d at 1086-87. We so held despite the concern expressed by the district court that if the maps fell

into the wrong hands harm to the goshawks could result. *Id.* at 1084.

Other cases include *Audubon Society v. United States Forest Service*, 104 F.3d 1201 (10th Cir. 1997), *Living Rivers, Inc. v. United States Bureau of Reclamation*, 273 F. Supp. 2d 1313 (D. Utah 2003), and *DeLorme Publishing Co. v. National Oceanic & Atmospheric Administration of the United States Department of Commerce*, 917 F. Supp. 867 (D. Me. 1996). In *Audubon*, the Tenth Circuit held that maps identifying Mexican spotted owl nest sites were not protected from disclosure under Exemption 2. 104 F.3d at 1204. In *Living Rivers*, the district court determined that the Bureau of Reclamation could not withhold maps showing which downstream areas would be flooded if the Hoover Dam or the Glen Canyon Dam failed. 272 F. Supp. 2d at 1318. The court so held despite the government's contention that releasing the maps "would [compromise] dam security and the security of the surrounding populations." *Id.* at 1315. In *DeLorme*, the district court rejected the National Oceanic and Atmospheric Administration's attempt to withhold compilations of its nautical charts from disclosure under Exemption 2. 917 F. Supp. at 876.

The key question in these cases was not whether the documents at issue were maps per se, but rather the consequence of the release of the maps. Even though there was some potential risk of harm from the release of the maps, their release did not risk circumvention of regulation by regulated persons or entities. I agree with the majority that releasing a map showing the location of cameras in a prison would be protected under Exemption 2. *See* Maj. Op. at 10367 n.6. Such a map would be protected because its disclosure would risk circumvention of regulation by regulated persons, i.e. by the prison's inmates. But our case is quite different. In our case, there is — at least, according to the Navy — a risk of harm from release of the maps. But the risk is not that a regu-

lated person or entity will be thereby assisted in avoiding the agency's regulation.

Given the foregoing extensive and consistent lines of precedent, the conclusion is inescapable that the arc maps at issue in this case are not exempt under Exemption 2. The ESQD arc maps do not qualify for Exemption 2 under this circuit's analysis in *Hardy* and *Dirksen*; under the D.C. Circuit's analysis in *Crooker* and subsequent cases; or under the analyses of the other circuits. The arc maps are not "procedural manuals [or] guidelines used by the agency in discharging its regulatory function" whose disclosure "to the subjects of regulation" might result in the "circumvention of agency regulations." *Crooker*, 670 F.2d at 1066. Rather, the maps fall squarely under the analysis in our circuit's decision in *Maricopa*, in the Tenth Circuit's decision in *Audubon*, and in the district courts' decisions in *Living Rivers* and *DeLorme*. I would therefore hold that the ESQD arc maps at issue in this appeal are not exempt under Exemption 2.

## C.   FOIA Exemption 7(F)

Because I would hold that the ESQD arc maps are not exempt under Exemption 2, I would also reach the question whether the maps are exempt under Exemption 7(F). Exemption 7(F) covers "matters that are . . . records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). I would hold that the ESQD arc maps are not covered under Exemption 7(F) because they were not "compiled for law enforcement purposes."

The Navy has the burden of proving that it is a "law enforcement" agency and that the ESQD arc maps were "compiled for law enforcement purposes." *Church of Scientology of Cal. v. U.S. Dep't of the Army*, 611 F.2d 738, 748

(9th Cir. 1980). An agency with a " 'mixed' function, encompassing both administrative and law enforcement functions, must demonstrate that it had a purpose falling within its sphere of enforcement authority in compiling the particular document." *Id.* A law enforcement purpose is an "adjudicative or enforcement purpose[ ]," such as the "enforcement of any statute or regulation within the authority" of the agency. *Id.* "Information need not have been originally compiled for law enforcement purposes in order to qualify for the 'law enforcement' exemption, so long as it was compiled for law enforcement purposes at the time the FOIA request was made." *Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1082 (9th Cir. 2004) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 155 (1989)).

The Navy concedes that it is an agency with a mixed function. Therefore, it must demonstrate that it "had a law enforcement purpose based upon properly delegated enforcement authority" for compiling the ESQD arc maps. *Church of Scientology*, 611 F.2d at 748. The Navy does not meet this standard. Agencies with law enforcement powers have the ability to conduct investigations or adjudications to enforce laws or regulations. *See, e.g.*, *Church of Scientology Int'l v. I.R.S.*, 995 F.2d 916, 919 (9th Cir. 1993) (finding that the Exempt Organization Division of the IRS performs a law enforcement function "by enforcing the provisions of the federal tax code that relate to qualification for tax exempt status"); *Lewis v. I.R.S.*, 823 F.2d 375, 379 (9th Cir. 1987) (holding that the I.R.S. has a law enforcement purpose in the context of a criminal tax investigation); *Binion v. U.S. Dep't of Justice*, 695 F.2d 1189, 1194 (9th Cir. 1983) (stating that the F.B.I. has a "clear law enforcement mandate"). The divisions of the Navy responsible for producing ESQD arc maps and conducting operations on NMII have no such powers. These divisions are distinct from those with investigative powers, such as the Naval Investigative Service of the Office of Naval Intelligence, which we examined in *Church of Scientology*. 611 F.2d at 748.

Even if the branch of the Navy that created the ESQD arc maps had law enforcement authority, these documents were not compiled for law enforcement purposes. Commander Whitbred stated that the Navy "use[s] these arcs to design, array, and construct ammunition storage facilities, and to organize ammunition operations for risk mitigation and enhanced safety." This is not an "adjudicative or enforcement purpose[ ]." *Church of Scientology*, 611 F.2d at 748. I would therefore hold that the ESQD arc maps at issue in this appeal are not exempt under Exemption 7(F).

### D.   FOIA Exemption 1

I am myself a former Navy officer. I yield to no one in my admiration for the care and professionalism of the Navy in its handling of ordnance, at NMII and elsewhere.

There is reason to suspect that the Navy's reluctance to release the ESQD arc maps for NMII is not based on the danger to national security that might be posed if the arc maps were released to Milner and the general public, but rather on the political difficulties that might be created by their release. This is strongly suggested by the contrast between the Navy's behavior with respect to the arc maps for the Bangor base and its behavior with respect to comparable arc maps for NMII. The Navy voluntarily provided to Milner under FOIA numerous ESQD arc maps for the Bangor base. That base is located four to five miles across land from the nearest town. So far as the record reveals, there was little political sensitivity to the possible dangers posed by the storage of conventional ordnance at Bangor.

By contrast, the Navy has been unwilling to provide to Milner the comparable ESQD arc maps for the same type of ordnance stored at NMII. NMII is located a little more than two miles across open water from Port Townsend and a little more than a mile across open water from Port Hadlock and Irondale. It is clear from the record that there is substantial politi-

cal sensitivity to the possible danger posed by the storage of ordnance at NMII. This political sensitivity is shown, for example, by Jefferson County Commissioner Johnson's invitation to the Navy to appear at a public forum to discuss "NAV MAG Indian Island and the plans for the island" on a panel with local hospital, emergency operations, law enforcement and fire fighting personnel. The nature of the Navy's response is shown by its unwillingness to accept the invitation, and its preference instead to continue to conduct its "current outreach program" in which Captain Kurtz, appearing alone, spoke to various community groups and civic organizations.

Commander Whitbred states in his declaration that a person may be able to "reverse engineer" ESQD arc maps, and thereby to discover information about "particular ammunition, explosive[s and] weapons systems," with possible adverse consequences for national security. I have trouble reconciling Commander Whitbred's statement about the national security risks of releasing the ESQD arc maps for NMII with the Navy's failure to classify these maps. Exemption 1 of FOIA specifically exempts from disclosure classified matters "kept secret in the interest of national defense or foreign policy." 5 U.S.C. § 552(b)(1). This exemption is specifically designed to allow government agencies to withhold information that might jeopardize our national security. If the disclosure of the ESQD arc maps is as dangerous as Commander Whitbread claims, the Navy is acting irresponsibly by not classifying them. I would be willing to remand to the district court, even at this late stage in the litigation, in order to give the Navy an opportunity to classify the arc maps at NMII and thereby to qualify them under Exemption 1 if it truly believes that Commander Whitbred's stated concerns about reverse engineering are legitimate. But my colleagues in the majority have declined to follow this course.

## Conclusion

FOIA is a careful "balance between the interests of the public in greater access to information and the needs of the Gov-

ernment to protect certain kinds of information from disclosure." *John Doe Agency*, 493 U.S. at 157. FOIA protects information that, if released, would jeopardize our national security or endanger the lives of individuals. Such information is protected under Exemption 1 if it is classified and under Exemption 7(F) if it is "compiled for law enforcement purposes" and "could reasonably be expected to endanger the life or physical safety of any individual" if disclosed. The majority's determination to expand Exemption 2 to protect information that the Navy has not seen fit to classify distorts Congress's careful balance and defies the Supreme Court's instruction that FOIA exemptions "must be narrowly construed" and are "explicitly exclusive." *Rose*, 425 U.S. at 361; *Tax Analysts*, 492 U.S. at 151 (quoting *Robertson*, 422 U.S. at 262).

I conclude, based on a long line of consistent precedent in this and other circuits, that neither Exemption 2 nor Exemption 7(F) applies to the arc maps at issue in this appeal. I respectfully dissent.