(Slip Opinion)          OCTOBER  TERM,  2010          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MILNER *v*. DEPARTMENT OF THE NAVY

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–1163.   Argued December 1, 2010—Decided March 7, 2011

The Freedom of Information Act (FOIA) requires federal agencies to make Government records available to the public, subject to nine exemptions.  This case concerns Exemption 2, which protects from disclosure material "related solely to the internal personnel rules and practices of an agency."  5 U. S. C.§552(b)(2).  This provision replaced an Administrative Procedure Act (APA) exemption for "any matter relating solely to the internal management of an agency," 5 U. S. C. §1002 (1964 ed.).  Congress believed that the "sweep" of the phrase "internal management" had led to excessive withholding, and drafted Exemption 2 "to have a narrower reach."  *Department of Air Force* v. *Rose*, 425 U. S. 352, 362–363.

   In *Rose,* the Court found that Exemption 2 could not be invoked to withhold Air Force Academy honor and ethics hearing summaries. The exemption, the Court suggested, primarily targets material concerning employee relations or human resources.  But the Court stated a possible caveat: That understanding of the provision's coverage governed "at least where the situation is not one where disclosure may risk circumvention of agency regulation."  *Id.,* at 369.  The D. C. Circuit subsequently converted this caveat into a new definition of Exemption 2's scope, finding that the exemption also covered any "predominantly internal" materials whose disclosure would "significantly ris[k] circumvention of agency regulation or statutes."  *Crooker* v. *Bureau of Alcohol, Tobacco & Firearms*, 670 F. 2d 1051, 1056– 1057, 1074.  Courts now use the term "Low 2" for human resources and employee relations records and "High 2" for records whose disclosure would risk circumvention of the law.

   Petitioner Milner submitted FOIA requests for explosives data and maps used by respondent Department of the Navy (Navy or Govern-

ment) in storing munitions at a naval base in Washington State. Stating that disclosure would threaten the security of the base and surrounding community, the Navy invoked Exemption 2 and refused to release the data. The District Court granted the Navy summary judgment, and the Court of Appeals affirmed, relying on the High 2 interpretation.

*Held:* Because Exemption 2 encompasses only records relating to employee relations and human resources issues, the explosives maps and data requested here do not qualify for withholding under that exemption. Pp. 6–19.

    (a) Exemption 2 shields only those records relating to "personnel rules and practices." When used as an adjective in this manner, the key statutory word "personnel" refers to human resources matters. For example, a "personnel department" deals with employee problems and interviews applicants for jobs. FOIA Exemption 6 provides another example, protecting certain "personnel . . . files" from disclosure. §552(b)(6). "[T]he common and congressional meaning of . . . 'personnel file'" is a file maintained by a human resources office collecting personal information about employees, such as examination results and work performance evaluations. *Rose, supra,* at 377. Exemption 2 uses "personnel" in the exact same way. An agency's "personnel rules and practices" all share a critical feature: They concern conditions of employment in federal agencies—such matters as hiring and firing, work rules and discipline, compensation and benefits. These items currently fall within the so-called Low 2 exemption. And under this Court's construction of the statutory language, Low 2 is all of 2.

    FOIA's purpose reinforces this reading. The statute's goal is "broad disclosure," and the exemptions must be "given a narrow compass." *Department of Justice* v. *Tax Analysts*, 492 U. S. 136, 151. A narrow construction stands on especially firm footing with respect to Exemption 2, which was intended to hem in the expansive withholding that occurred under the prior APA exemption for "internal management" records.

    Exemption 2, as interpreted here, does not reach the requested explosives information. The data and maps, which calculate and visually portray the magnitude of hypothetical detonations, in no way relate to "personnel rules and practices," as that term is most naturally understood. Pp. 6–10.

    (b) The Government's two alternative readings of Exemption 2 cannot be squared with the statute. Pp. 10–17.

    (c) While the Navy has a strong security interest in shielding the explosives data and maps from public disclosure, the Government has other tools at hand to protect such information: FOIA Exemption

Syllabus

1 prevents access to classified documents; Exemption 3 applies to re-
cords that any other statute exempts from disclosure; and Exemption
7 protects "information compiled for law enforcement purposes" if its
release, *inter alia,* "could reasonably be expected to endanger the life
or physical safety of any individual," §552(b)(7)(F). The Navy's ar-
gument that the explosives information is exempt under Exemption 7
remains open for the Ninth Circuit to address on remand. And if
these or other exemptions do not cover records whose release would
threaten the Nation's vital interests, the Government may of course
seek relief from Congress. Pp. 17–18.

575 F. 3d 959, reversed and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and SCALIA, KENNEDY, THOMAS, GINSBURG, ALITO, and SOTOMAYOR,
JJ., joined. ALITO, J., filed a concurring opinion. BREYER, J., filed a
dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–1163

## GLEN SCOTT MILNER, PETITIONER *v.* DEPARTMENT OF THE NAVY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 7, 2011]

JUSTICE KAGAN delivered the opinion of the Court.

The Freedom of Information Act (FOIA), 5 U. S. C. §552, requires federal agencies to make Government records available to the public, subject to nine exemptions for specific categories of material. This case concerns the scope of Exemption 2, which protects from disclosure material that is "related solely to the internal personnel rules and practices of an agency." §552(b)(2). Respondent Department of the Navy (Navy or Government) invoked Exemption 2 to deny a FOIA request for data and maps used to help store explosives at a naval base in Washington State. We hold that Exemption 2 does not stretch so far.

I

Congress enacted FOIA to overhaul the public-disclosure section of the Administrative Procedure Act (APA), 5 U. S. C. §1002 (1964 ed.). That section of the APA "was plagued with vague phrases" and gradually became more "a withholding statute than a disclosure statute." *EPA* v. *Mink*, 410 U. S. 73, 79 (1973). Congress intended FOIA to "permit access to official information

long shielded unnecessarily from public view." *Id.,* at 80.
FOIA thus mandates that an agency disclose records on
request, unless they fall within one of nine exemptions.
These exemptions are "explicitly made exclusive," *id.*, at
79, and must be "narrowly construed," *FBI* v. *Abramson*,
456 U. S. 615, 630 (1982).

At issue here is Exemption 2, which shields from com-
pelled disclosure documents "related solely to the internal
personnel rules and practices of an agency." §552(b)(2).
Congress enacted Exemption 2 to replace the APA's ex-
emption for "any matter relating solely to the internal
management of an agency," 5 U. S. C. §1002 (1964 ed.).
Believing that the "sweep" of the phrase "internal man-
agement" had led to excessive withholding, Congress
drafted Exemption 2 "to have a narrower reach." *Depart-
ment of Air Force* v. *Rose*, 425 U. S. 352, 362–363 (1976).

We considered the extent of that reach in *Department of
Air Force* v. *Rose*. There, we rejected the Government's
invocation of Exemption 2 to withhold case summaries of
honor and ethics hearings at the United States Air Force
Academy. The exemption, we suggested, primarily targets
material concerning employee relations or human re-
sources: "use of parking facilities or regulations of lunch
hours, statements of policy as to sick leave, and the like."
*Id.,* at 363 (quoting S. Rep. No. 813, 89th Cong., 1st Sess.,
8 (1965) (hereinafter S. Rep.)); see *Rose,* 425 U. S., at 367.
"[T]he general thrust" of Exemption 2, we explained, "is
simply to relieve agencies of the burden of assembling and
maintaining [such information] for public inspection." *Id.,*
at 369. We concluded that the case summaries did not fall
within the exemption because they "d[id] not concern only
routine matters" of "merely internal significance." *Id.,* at
370. But we stated a possible caveat to our interpretation
of Exemption 2: That understanding of the provision's
coverage governed, we wrote, "at least where the situation

is not one where disclosure may risk circumvention of agency regulation." *Id.,* at 369.

In *Crooker* v. *Bureau of Alcohol, Tobacco & Firearms*, 670 F. 2d 1051 (1981), the D. C. Circuit converted this caveat into a new definition of Exemption 2's scope. *Crooker* approved the use of Exemption 2 to shield a manual designed to train Government agents in law enforcement surveillance techniques. The D. C. Circuit noted that it previously had understood Exemption 2 to "refe[r] only to 'pay, pensions, vacations, hours of work, lunch hours, parking, etc.'" *Id.,* at 1056 (quoting *Jordan* v. *Department of Justice*, 591 F. 2d 753, 763 (1978)). But the court now thought Exemption 2 should also cover any "predominantly internal" materials,[1] *Crooker*, 670 F. 2d, at 1056–1057, whose disclosure would "significantly ris[k] circumvention of agency regulations or statutes," *id.,* at 1074. This construction of Exemption 2, the court reasoned, flowed from FOIA's "overall design," its legislative history, "and even common sense," because Congress could not have meant to "enac[t] a statute whose provisions undermined . . . the effectiveness of law enforcement agencies." *Ibid.*

In the ensuing years, three Courts of Appeals adopted the D. C. Circuit's interpretation of Exemption 2. See 575 F. 3d 959, 965 (CA9 2009) (case below); *Massey* v. *FBI*, 3 F. 3d 620, 622 (CA2 1993); *Kaganove* v. *EPA*, 856 F. 2d 884, 889 (CA7 1988).[2] And that interpretation spawned a

_____

[1] The court adopted the "predominantly internal" standard as a way of implementing the exemption's requirement that materials "relat[e] solely to" an agency's internal personnel rules and practices. The word "solely," the court reasoned, "has to be given the construction, consonant with reasonableness, of 'predominantly'" because otherwise "solely" would conflict with the expansive term "related." 670 F. 2d, at 1056 (some internal quotation marks omitted).

[2] Three other Courts of Appeals had previously taken a narrower view of Exemption 2's scope, consistent with the interpretation adopted in

new terminology: Courts applying the *Crooker* approach now refer to the "Low 2" exemption when discussing materials concerning human resources and employee relations, and to the "High 2" exemption when assessing records whose disclosure would risk circumvention of the law. See, *e.g.,* 575 F. 3d, at 963; *Schiller* v. *NLRB*, 964 F. 2d 1205, 1208 (CADC 1992). Congress, as well, took notice of the D. C. Circuit's decision, borrowing language from *Crooker* to amend Exemption 7(E) when next enacting revisions to FOIA. The amended version of Exemption 7(E) shields certain "records or information compiled for law enforcement purposes" if their disclosure "could reasonably be expected to risk circumvention of the law." §552(b)(7)(E); see Freedom of Information Reform Act of 1986, §1802(a), 100 Stat. 3207–49.

## II

The FOIA request at issue here arises from the Navy's operations at Naval Magazine Indian Island, a base in Puget Sound, Washington. The Navy keeps weapons, ammunition, and explosives on the island. To aid in the storage and transport of these munitions, the Navy uses data known as Explosive Safety Quantity Distance (ESQD) information. 575 F. 3d, at 962. ESQD information prescribes "minimum separation distances" for explosives and helps the Navy design and construct storage

---

*Rose.* See *Cox* v. *Department of Justice*, 576 F. 2d 1302, 1309–1310 (CA8 1978) (concluding that Exemption 2 covers only an agency's internal "housekeeping matters" (internal quotation marks omitted)); *Stokes* v. *Brennan*, 476 F. 2d 699, 703 (CA5 1973) (holding that Exemption 2 "must not be read so broadly as to exempt" an Occupational Safety and Health Administration manual for training compliance officers); *Hawkes* v. *IRS*, 467 F. 2d 787, 797 (CA6 1972) ("[T]he internal practices and policies referred to in [Exemption 2] relate only to . . . employee-employer type concerns"). These Circuits have never revised their understandings of the exemption. See *infra*, at 13, n. 7.

facilities to prevent chain reactions in case of detonation. *Ibid.* The ESQD calculations are often incorporated into specialized maps depicting the effects of hypothetical explosions. See, *e.g.,* App. 52.

In 2003 and 2004, petitioner Glen Milner, a Puget Sound resident, submitted FOIA requests for all ESQD information relating to Indian Island. 575 F. 3d, at 962. The Navy refused to release the data, stating that disclosure would threaten the security of the base and surrounding community. In support of its decision to withhold the records, the Navy invoked Exemption 2. *Ibid.*[3]

The District Court granted summary judgment to the Navy, and the Court of Appeals affirmed, relying on the High 2 interpretation developed in *Crooker*. 575 F. 3d, at 963. The Court of Appeals explained that the ESQD information "is predominantly used for the internal purpose of instructing agency personnel on how to do their jobs." *Id.*, at 968. And disclosure of the material, the court determined, "would risk circumvention of the law" by "point[ing] out the best targets for those bent on wreaking havoc"—for example, "[a] terrorist who wished to hit the most damaging target." *Id.,* at 971. The ESQD information, the court concluded, therefore qualified for a High 2 exemption. 575 F. 3d, at 971.

We granted certiorari in light of the Circuit split respecting Exemption 2's meaning, 561 U. S. ___ (2010), and we now reverse.

_____

[3] The Navy also invoked Exemption 7(F), which applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such . . . records . . . could reasonably be expected to endanger the life or physical safety of any individual." 5 U. S. C. §552(b)(7)(F). The courts below did not decide whether the Navy could withhold the ESQD data under that exemption. 575 F. 3d 959, 971, n. 8 (CA9 2009); No. CV–06–01301 (WD Wash., Oct. 30, 2007), App. to Pet. for Cert. 4, 25, 2007 WL 3228049, *8.

### III

Our consideration of Exemption 2's scope starts with its text. See, *e.g., Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*, 469 U. S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose"). Judicial decisions since FOIA's enactment have analyzed and reanalyzed the meaning of the exemption. But comparatively little attention has focused on the provision's 12 simple words: "related solely to the internal personnel rules and practices of an agency."

The key word in that dozen—the one that most clearly marks the provision's boundaries—is "personnel." When used as an adjective, as it is here to modify "rules and practices," that term refers to human resources matters. "Personnel," in this common parlance, means "the selection, placement, and training of employees and . . . the formulation of policies, procedures, and relations with [or involving] employees or their representatives." Webster's Third New International Dictionary 1687 (1966) (hereinafter Webster's). So, for example, a "personnel department" is "the department of a business firm that deals with problems affecting the employees of the firm and that usually interviews applicants for jobs." Random House Dictionary 1075 (1966) (hereinafter Random House). "Personnel management" is similarly "the phase of management concerned with the engagement and effective utilization of manpower to obtain optimum efficiency of human resources." Webster's 1687. And a "personnel agency" is "an agency for placing employable persons in jobs; employment agency." Random House 1075.

FOIA itself provides an additional example in Exemption 6. See *Ratzlaf* v. *United States*, 510 U. S. 135, 143 (1994) ("A term appearing in several places in a statutory

text is generally read the same way each time it appears"). That exemption, just a few short paragraphs down from Exemption 2, protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." §552(b)(6). Here too, the statute uses the term "personnel" as a modifier meaning "human resources." See Tr. of Oral Arg. 32 ("[The Court:] It's [an] H. R. file, right? [The Government:] That's generally true"). As we recognized in *Rose*, "the common and congressional meaning of . . . 'personnel file'" is the file "showing, for example, where [an employee] was born, the names of his parents, where he has lived from time to time, his . . . school records, results of examinations, [and] evaluations of his work performance." 425 U. S., at 377. It is the file typically maintained in the human resources office—otherwise known (to recall an example offered above) as the "personnel department." *Ibid.*

Exemption 2 uses "personnel" in the exact same way. An agency's "personnel rules and practices" are its rules and practices dealing with employee relations or human resources. The D. C. Circuit, in a pre-*Crooker* decision, gave as examples "matters relating to pay, pensions, vacations, hours of work, lunch hours, parking, etc." *Jordan*, 591 F. 2d, at 763; see *supra*, at 3. That "etc." is important; we doubt any court could know enough about the Federal Government's operations to formulate a comprehensive list. But all the rules and practices referenced in Exemption 2 share a critical feature: They concern the conditions of employment in federal agencies—such matters as hiring and firing, work rules and discipline, compensation and benefits.[4] Courts in practice have had little

———————

[4] Government records also must satisfy the other requirements of Exemption 2 to be exempt from disclosure. Information must "relat[e] solely"—meaning, as usual, "exclusively or only," Random House 1354

difficulty identifying the records that qualify for withhold-
ing under this reading: They are what now commonly fall
within the Low 2 exemption. Our construction of the
statutory language simply makes clear that Low 2 is all of
2 (and that High 2 is not 2 at all, see *infra*, at 10–14).

The statute's purpose reinforces this understanding of
the exemption. We have often noted "the Act's goal of
broad disclosure" and insisted that the exemptions be
"given a narrow compass." *Department of Justice* v. *Tax
Analysts*, 492 U. S. 136, 151 (1989); see *Department of
Interior* v. *Klamath Water Users Protective Assn.*, 532 U. S.
1, 7–8 (2001).[5] This practice of "constru[ing] FOIA exemp-
tions narrowly," *Department of Justice* v. *Landano*, 508
U. S. 165, 181 (1993), stands on especially firm footing
with respect to Exemption 2. As described earlier, Con-
gress worded that provision to hem in the prior APA ex-
emption for "any matter relating solely to the internal
management of an agency," which agencies had used to
prevent access to masses of documents. See *Rose*, 425
U. S., at 362. We would ill-serve Congress's purpose by

—————

—to the agency's "personnel rules and practices." And the information
must be "internal"; that is, the agency must typically keep the records
to itself for its own use. See Webster's 1180 ("internal" means "existing
or situated within the limits . . . of something"). An agency's human
resources documents will often meet these conditions.

[5] The dissent would reject this longstanding rule of construction in
favor of an approach asking courts "to turn Congress' public informa-
tion objectives into workable agency practice." *Post*, at 8–9 (opinion of
BREYER, J.). But nothing in FOIA either explicitly or implicitly grants
courts discretion to expand (or contract) an exemption on this basis. In
enacting FOIA, Congress struck the balance it thought right—generally
favoring disclosure, subject only to a handful of specified exemptions—
and did so across the length and breadth of the Federal Government.
See, *e.g.*, *John Doe Agency* v. *John Doe Corp.*, 493 U. S. 146, 152–153
(1989). The judicial role is to enforce that congressionally determined
balance rather than, as the dissent suggests, *post*, at 4–6, to assess case
by case, department by department, and task by task whether disclo-
sure interferes with good government.

construing Exemption 2 to reauthorize the expansive withholding that Congress wanted to halt. Our reading instead gives the exemption the "narrower reach" Congress intended, *id.,* at 363, through the simple device of confining the provision's meaning to its words.

The Government resists giving "personnel" its plain meaning on the ground that Congress, when drafting Exemption 2, considered but chose not to enact language exempting "internal employment rules and practices." Brief for Respondent 30–34, and n. 11. This drafting history, the Navy maintains, proves that Congress did not wish "to limit the Exemption to employment-related matters," *id.,* at 31, even if the adjective "personnel" conveys that meaning in other contexts, *id.,* at 41. But we think the Navy's evidence insufficient: The scant history concerning this word change as easily supports the inference that Congress merely swapped one synonym for another. Cf. *Mead Corp.* v. *Tilley*, 490 U. S. 714, 723 (1989) (noting with respect to the "unexplained disappearance of one word from an unenacted bill" that "mute intermediate legislative maneuvers are not reliable" aids to statutory interpretation (internal quotation marks omitted)). Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language.

Exemption 2, as we have construed it, does not reach the ESQD information at issue here. These data and maps calculate and visually portray the magnitude of hypothetical detonations. By no stretch of imagination do they relate to "personnel rules and practices," as that term is most naturally understood. They concern the physical rules governing explosives, not the workplace rules governing sailors; they address the handling of dangerous

materials, not the treatment of employees. The Navy therefore may not use Exemption 2, interpreted in accord with its plain meaning to cover human resources matters, to prevent disclosure of the requested maps and data.

## IV

The Government offers two alternative readings of Exemption 2 to support withholding the ESQD information. We cannot square either with the statute.

## A

The Navy first encourages us to adopt the construction of Exemption 2 pioneered by *Crooker*, which shields material not only if it meets the criteria set out above (Low 2), but also if it is "predominant[ly] interna[l]" and its "disclosure would significantly risk[] circumvention of federal agency functions" (High 2). Brief for Respondent 41 (internal quotation marks omitted). The dissent, too, favors this reading of the statute. *Post*, at 1. But the *Crooker* interpretation, as already suggested, suffers from a patent flaw: It is disconnected from Exemption 2's text. The High 2 test (in addition to substituting the word "predominantly" for "solely," see n. 1, *supra*) ignores the plain meaning of the adjective "personnel," see *supra*, at 6–9, and adopts a circumvention requirement with no basis or referent in Exemption 2's language. Indeed, the only way to arrive at High 2 is by taking a red pen to the statute— "cutting out some" words and "pasting in others" until little of the actual provision remains. *Elliott* v. *Department of Agriculture*, 596 F. 3d 842, 845 (CADC 2010). Because this is so, High 2 is better labeled "Non 2" (and Low 2 . . . just 2).

In support of its text-light approach to the statute, the Government relies primarily on legislative history, placing particular emphasis on the House Report concerning FOIA. See Brief for Respondent 33–38. A statement in that Report buttresses the High 2 understanding of the

exemption and, indeed, specifically rejects the Low 2 construction. According to the Report: "Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure [under Exemption 2], but this exemption would not cover . . . employee relations and working conditions and routine administrative procedures." H. R. Rep. No. 1497, 89th Cong., 2d Sess., 10 (1966). But the Senate Report says exactly the opposite, explaining in support of a Low 2 interpretation that the phrase "internal personnel rules and practices of an agency" means "rules as to personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick leave, and the like." S. Rep., at 8.[6] In *Rose*, we gave reasons for thinking the Senate Report the more reliable of the two. See 425 U. S., at 366. But the more fundamental point is what we said before: Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it. See *supra*, at 9; *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, 49 (1950) (declining to consult legislative history when that "history is more conflicting than the text is ambiguous"). When presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language.

The Government also advances, in support of *Crooker*'s High 2 approach, an argument based on subsequent legislative action. Congress, the Government notes, amended Exemption 7(E) in 1986 to cover law enforcement records whose production "would disclose techniques and procedures for law enforcement investigations or prosecutions,

---

[6] We are perplexed that the dissent takes seriously *Crooker*'s notion that the reports are "reconcilable." *Post,* at 4. To strip the matter to its essentials, the House Report says: "Exemption 2 means A, but not B." The Senate Report says: "Exemption 2 means B." That is the very definition of "irreconcilable."

or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." §552(b)(7)(E).   That amendment, the Government contends, codified *Crooker*'s "circumvention of the law" standard and, in so doing, ratified *Crooker*'s holding.  Brief for Respondent 42–43.  The dissent likewise counts as significant that Congress "t[ook] note" of *Crooker* in revising FOIA.  *Post*, at 9; see *post*, at 2.

But the Government and the dissent neglect the key feature of the 1986 amendment: Congress modified not Exemption 2 (the subject of *Crooker*), but instead Exemption 7(E).  And the *Crooker* construction of Exemption 2 renders Exemption 7(E) superfluous and so deprives that amendment of any effect.  See, *e.g., TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001) (noting canon that statutes should be read to avoid making any provision "superfluous, void, or insignificant" (internal quotation marks omitted)).  We cannot think of any document eligible for withholding under Exemption 7(E) that the High 2 reading does not capture: The circumvention standard is the same, and the law enforcement records listed in Exemption 7(E) are "predominantly internal."  So if Congress had agreed with *Crooker*'s reading of Exemption 2, it would have had no reason to alter Exemption 7(E).  In that event, Congress would either have left the statute alone (on the theory that *Crooker* would do the necessary work) or would have amended Exemption 2 specifically to ratify *Crooker*.  The decision instead to amend Exemption 7(E) suggests that Congress approved the circumvention standard only as to law enforcement materials, and not as to the wider set of records High 2 covers.  Perhaps this legislative action does not show that Congress affirmatively disagreed with *Crooker;* maybe Congress was agnostic about whether the circumvention standard should apply to other records.  But one thing is clear: The 1986 amendment does not

ratify, approve, or otherwise signal agreement with *Crooker*'s interpretation of Exemption 2. This argument therefore cannot save the High 2 construction.

The dissent offers one last reason to embrace High 2, and indeed stakes most of its wager on this argument. *Crooker*, the dissent asserts, "has been consistently relied upon and followed for 30 years" by other lower courts. *Post*, at 9; see *post*, at 1–2. But this claim, too, trips at the starting gate. It would be immaterial even if true, because we have no warrant to ignore clear statutory language on the ground that other courts have done so. And in any event, it is not true. Prior to *Crooker*, three Circuits adopted the reading of Exemption 2 we think right, and they have not changed their minds. See n. 2, *supra*.[7]

_____

[7] The dissent's view that "two of th[ese] Circuits [have] not adher[ed] to their early positions" is incorrect. *Post*, at 2. In *Abraham & Rose, P.L.C.* v. *United States*, cited by the dissent, the Sixth Circuit rejected the Government's claim that Exemption 2 shielded records of federal tax lien filings. 138 F. 3d 1075, 1082 (1998). The court nowhere discussed the High 2 versus Low 2 question at issue here. Its only reference to *Crooker* concerned the part of that decision interpreting "solely" to mean "predominantly." See 138 F.3d*,* at 1080; see also n. 1, *supra*. Subsequently, the Sixth Circuit once again held, in *Rugiero* v. *Department of Justice*, that Exemption 2 applies to "routine matters of merely internal significance." 257 F. 3d 534, 549 (2001). In *Sladek* v. *Bensinger*, which the dissent also cites, the Fifth Circuit insisted that the Government disclose a Drug Enforcement Administration agent's manual because it "is not the type of trivial rule, such as allocation of parking facilities, that is covered by Exemption 2." 605 F. 2d 899, 902 (1979). In confirming this Low 2 interpretation of the statute, the court acknowledged that another Circuit had embraced the High 2 standard. The court, however, declined to consider this alternative interpretation because it would not have changed the case's outcome. See *ibid.* Finally, the Eighth Circuit's last word on Exemption 2 is clear, and the dissent does not say otherwise. The exemption, according to that most recent Eighth Circuit decision, applies "only [to an agency's] housekeeping matters." *Cox*, 576 F. 2d, at 1309–1310 (internal quotation marks omitted). The dissent is surely right to say, *post* at 2, that *Crooker* "has guided nearly every FOIA case decided over the last 30 years" in

Since *Crooker*, three other Circuits have accepted the High 2 reading. See *supra*, at 3. One Circuit has reserved judgment on the High 2-Low 2 debate. See *Audubon Society* v. *Forest Serv.*, 104 F. 3d 1201, 1203–1204 (CA10 1997). And the rest have not considered the matter. (No one should think *Crooker* has been extensively discussed or debated in the Courts of Appeals. In the past three decades, *Crooker*'s analysis of Exemption 2 has been cited a sum total of five times in federal appellate decisions outside the D. C. Circuit—on average, once every six years.) The result is a 4 to 3 split among the Circuits.[8] We will not flout all usual rules of statutory interpretation to take the side of the bare majority.

B

Presumably because *Crooker* so departs from Exemption 2's language, the Government also offers another construction, which it says we might adopt "on a clean slate," "based on the plain text . . . alone." Brief for Respondent 15. On this reading, the exemption "encompasses records concerning an agency's internal rules and practices for its personnel to follow in the discharge of their governmental functions." *Id.,* at 20; see also *id.,* at 13–14 (Exemption 2 "applies generally to matters concerning internal rules and practices to guide agency personnel in performing

_____

Circuits applying *Crooker*; but that statement does not hold in the Circuits using the Low 2 approach.

[8] Notably, even those courts approving *Crooker* have disagreed about how to apply High 2. Fault lines include whether the risk of circumvention must be significant, see, *e.g., Hidalgo* v. *FBI*, 541 F. Supp. 2d 250, 253 (DC 2008); Pet. for Cert. 15–16; whether courts should consider the public interest in disclosure when calculating that risk, see, *e.g.,* Department of Justice, Guide to the Freedom of Information Act, p. 185 (2009); and whether an agency must regulate the person or entity threatening circumvention; compare, *e.g.,* 575 F. 3d, at 971, with, *e.g., id.,* at 978 (W. Fletcher, J., dissenting). The disagreement is not surprising. Because High 2 is nowhere evident in the statute, courts lack the normal guideposts for ascertaining its coverage.

their duties"). According to the Government, this inter-pretation makes sense because "the phrase 'personnel rules and practices of an agency' is logically understood to mean an agency's rules and practices *for its personnel*." *Id.,* at 20 (emphasis added).

But the purported logic in the Government's definition eludes us. We would not say, in ordinary parlance, that a "personnel file" is any file an employee uses, or that a "personnel department" is any department in which an employee serves. No more would we say that a "personnel rule or practice" is any rule or practice that assists an employee in doing her job. The use of the term "personnel" in each of these phrases connotes not that the file or de-partment or practice/rule is *for* personnel, but rather that the file or department or practice/rule is *about* personnel— *i.e.*, that it relates to employee relations or human re-sources. This case well illustrates the point. The records requested, as earlier noted, are explosives data and maps showing the distances that potential blasts travel. This information no doubt assists Navy personnel in storing munitions. But that is not to say that the data and maps relate to "personnel rules and practices." No one staring at these charts of explosions and using ordinary language would describe them in this manner.

Indeed, the Government's "clean slate" construction reaches such documents only by stripping the word "per-sonnel" of any real meaning. Under this interpretation, an agency's "internal personnel rules and practices" ap-pears to mean all its internal rules and practices. That is because agencies necessarily operate through personnel, and so all their internal rules and practices are for per-sonnel. The modifier "personnel," then, does no modifying work; it does not limit the class of internal rules and practices that Exemption 2 covers. What is most naturally viewed as the provision's key word—the term that ought

to define its scope—does nothing more than state the truism that in an agency it is "personnel" who follow internal rules and practices.

And this odd reading would produce a sweeping exemption, posing the risk that FOIA would become less a disclosure than "a withholding statute." *Mink*, 410 U. S., at 79. Many documents an agency generates in some way aid employees in carrying out their responsibilities. If Exemption 2 were to reach all these records, it would tend to engulf other FOIA exemptions, rendering ineffective the limitations Congress placed on their application. Exemption 7, for example, shields records compiled for law enforcement purposes, but only if one of six specified criteria is met. §552(b)(7). Yet on the Government's view, an agency could bypass these restrictions by invoking Exemption 2 whenever law enforcement records guide personnel in performing their duties. Indeed, an agency could use Exemption 2 as an all-purpose back-up provision to withhold sensitive records that do not fall within any of FOIA's more targeted exemptions.[9]

_____

[9] The dissent asserts that "30 years of experience" with a more expansive interpretation of the exemption suggests no "seriou[s] interfere[nce] with . . . FOIA's informational objectives." *Post*, at 6. But those objectives suffer any time an agency denies a FOIA request based on an improper interpretation of the statute. To give just one example, the U. S. Forest Service has wrongly invoked Exemption 2 on multiple occasions to withhold information about (of all things) bird nesting sites. See *Audubon Society* v. *Forest Serv.*, 104 F. 3d 1201, 1203 (CA10 1997)*; Maricopa Audubon Soc.* v. *Forest Serv.*, 108 F. 3d 1082, 1084 (CA9 1997). And recent statistics raise a concern that federal agencies may too readily use Exemption 2 to refuse disclosure. According to *amicus* Public Citizen, "while reliance on exemptions overall rose 83% from 1998 to 2006, reliance on Exemption 2 rose 344% during that same time period." Brief for Public Citizen et al. as *Amici Curiae* 24. In 2009 alone, federal departments cited Exemption 2 more than 72,000 times to prevent access to records. See Brief for Allied Daily Newspapers of Washington et al. as *Amici Curiae* 3. We do not doubt that many of these FOIA denials were appropriate. But we are unable to

Interpreted in this way, Exemption 2—call it "Super 2" now—would extend, rather than narrow, the APA's former exemption for records relating to the "internal management of an agency." 5 U. S. C. §1002 (1964 ed.). We doubt that even the "internal management" provision, which Congress thought allowed too much withholding, see *supra*, at 2, would have protected all information that guides employees in the discharge of their duties, including the explosives data and maps in this case. And perhaps needless to say, this reading of Exemption 2 violates the rule favoring narrow construction of FOIA exemptions. See, *e.g., Abramson*, 456 U. S., at 630; *Rose*, 425 U. S., at 361. Super 2 in fact has no basis in the text, context, or purpose of FOIA, and we accordingly reject it.

V

Although we cannot interpret Exemption 2 as the Government proposes, we recognize the strength of the Navy's interest in protecting the ESQD data and maps and other similar information. The Government has informed us that "[p]ublicly disclosing the [ESQD] information would significantly risk undermining the Navy's ability to safely and securely store military ordnance," Brief for Respondent 47, and we have no reason to doubt that representation. The Ninth Circuit similarly cautioned that disclosure of this information could be used to "wrea[k] havoc" and "make catastrophe more likely." 575 F. 3d, at 971. Concerns of this kind—a sense that certain sensitive information *should* be exempt from disclosure—in part led the *Crooker* court to formulate the High 2 standard. See 670 F. 2d, at 1074 (contending that "common sense" supported the High 2 interpretation because Congress would not have wanted FOIA to "undermin[e] . . . the effective-

—————

accept the dissent's unsupported declaration that a sweeping construction of Exemption 2 has not interfered with Congress's goal of broad disclosure.

ness of law enforcement agencies"). And we acknowledge that our decision today upsets three decades of agency practice relying on *Crooker*, and therefore may force considerable adjustments.

We also note, however, that the Government has other tools at hand to shield national security information and other sensitive materials. Most notably, Exemption 1 of FOIA prevents access to classified documents. §552(b)(1); see 575 F. 3d, at 980 (W. Fletcher, J., dissenting) (Exemption 1 is "specifically designed to allow government agencies to withhold information that might jeopardize our national security"). The Government generally may classify material even after receiving a FOIA request, see Exec. Order No. 13526, §1.7(d), 75 Fed. Reg. 711 (2009); an agency therefore may wait until that time to decide whether the dangers of disclosure outweigh the costs of classification. See Tr. of Oral Arg. 29–30. Exemption 3 also may mitigate the Government's security concerns. That provision applies to records that any other statute exempts from disclosure, §552(b)(3), thus offering Congress an established, streamlined method to authorize the withholding of specific records that FOIA would not otherwise protect. And Exemption 7, as already noted, protects "information compiled for law enforcement purposes" that meets one of six criteria, including if its release "could reasonably be expected to endanger the life or physical safety of any individual." §552(b)(7)(F). The Navy argued below that the ESQD data and maps fall within Exemption 7(F), see n. 3, *supra*, and that claim remains open for the Ninth Circuit to address on remand.

If these or other exemptions do not cover records whose release would threaten the Nation's vital interests, the Government may of course seek relief from Congress. See Tr. of Oral Arg. 48. All we hold today is that Congress has not enacted the FOIA exemption the Government desires.

We leave to Congress, as is appropriate, the question whether it should do so.

## VI

Exemption 2, consistent with the plain meaning of the term "personnel rules and practices," encompasses only records relating to issues of employee relations and human resources. The explosives maps and data requested here do not qualify for withholding under that exemption. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 09–1163

GLEN SCOTT MILNER, PETITIONER *v.* DEPARTMENT
OF THE NAVY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 7, 2011]

JUSTICE ALITO, concurring.

I agree with the Court that the text of Exemption 2 of the Freedom of Information Act of 1966 cannot support the "High 2" interpretation that courts have adopted and applied over the years. As the Court explains, however, the Government may avail itself of numerous other exemptions, see *ante*, at 18—exemptions that may have been overshadowed in recent years by the broad reach of High 2. I write separately to underscore the alternative argument that the Navy raised below, which rested on Exemption 7(F) and which will remain open on remand. See *ante*, at 5, n. 3, 18.

Exemption 7 applies to specific categories of information "compiled for law enforcement purposes." 5 U. S. C. §552(b)(7). In particular, Exemption 7(F) permits withholding of "records or information compiled for law enforcement purposes" that, if disclosed, "could reasonably be expected to endanger the life or physical safety of any individual." §552(b)(7)(F). In most cases involving security information, it is not difficult to show that disclosure may "endanger the life or physical safety of any individual." A more difficult question, however, is whether the information is "compiled for law enforcement purposes." See *John Doe Agency* v. *John Doe Corp.*, 493 U. S. 146, 153 (1989) ("Before it may invoke [Exemption 7], the Govern-

ment has the burden of proving the existence of . . . a compilation for such a purpose"). In my view, this phrase reasonably encompasses information used to fulfill official security and crime prevention duties.

*"Law enforcement purposes."* The ordinary understanding of law enforcement includes not just the investigation and prosecution of offenses that have already been committed, but also proactive steps designed to prevent criminal activity and to maintain security. A "law enforcement officer" is defined as one "whose duty it is to preserve the peace," Black's Law Dictionary 796 (5th ed. 1979), and fulfilling that duty involves a range of activities. Police on the beat aim to prevent crime from occurring, and they no less carry out "law enforcement purposes" than officers investigating a crime scene. Similarly, a "law-enforcement agency" is charged with "the apprehension of alleged offenders *as well as crime detection and prevention.*" R. De Sola, Crime Dictionary 82 (1982) (emphasis added).

Crime prevention and security measures are critical to effective law enforcement as we know it. There can be no doubt, for example, that the Secret Service acts with a law enforcement purpose when it protects federal officials from attack, even though no investigation may be ongoing. Likewise, steps by law enforcement officers to prevent terrorism surely fulfill "law enforcement purposes." Particularly in recent years, terrorism prevention and national security measures have been recognized as vital to effective law enforcement efforts in our Nation. Indeed, "[a]fter the September 11th attacks on America," the priorities of the Federal Bureau of Investigation "shifted dramatically," and the FBI's "top priority became the prevention of another terrorist attack." Hearings before the Subcommittee on Science, the Departments of State, Justice, and Commerce, and Related Agencies of the House Committee on Appropriations, 109th Cong., 2d Sess., pt. 10, 232 (2006) (testimony of FBI Director Robert

S. Mueller III). Today, "[t]he FBI's number one priority continues to be the prevention of terrorist attacks against the United States." Hearings before the Senate Committee on Homeland Security and Governmental Affairs, 111th Cong., 2d Sess, p. \_\_\_ (Sept. 22, 2010) (testimony of Mueller). If crime prevention and security measures do not serve "law enforcement purposes," then those charged with law enforcement responsibilities have little chance of fulfilling their duty to preserve the peace.

The context of Exemption 7 confirms that, read naturally, "law enforcement purposes" involve more than just investigation and prosecution. As Exemption 7's subparagraphs demonstrate, Congress knew how to refer to these narrower activities. See, *e.g.*, §552(b)(7)(A) (information that "could reasonably be expected to interfere with enforcement proceedings"); §552(b)(7)(E) (information that "would disclose techniques and procedures for law enforcement investigations or prosecutions"). Congress' decision to use different language to trigger Exemption 7 confirms that the concept of "law enforcement purposes" sweeps in activities beyond investigation and prosecution. See *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 711, n. 9 (2004) (applying the "usual rule" that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended" (internal quotation marks omitted)).

*"Compiled for law enforcement purposes."* This Court has given a fairly broad meaning to "compiled" under §552(b)(7). In *John Doe Agency*, we held that information need not have been originally "compiled for law enforcement purposes" to satisfy Exemption 7's threshold requirement. Rather, "even though . . . documents were put together at an earlier time for a different purpose," they may fall within Exemption 7 if they are later assembled for law enforcement purposes. 493 U. S., at 154–155. For

example, documents originally gathered for routine business purposes may fall within Exemption 7 if they are later compiled for use in a criminal investigation. Similarly, federal building plans and related information—which may have been compiled originally for architectural planning or internal purposes—may fall within Exemption 7 if that information is later compiled and given to law enforcement officers for security purposes.

Documents compiled for multiple purposes are not necessarily deprived of Exemption 7's protection. The text of Exemption 7 does not require that the information be compiled *solely* for law enforcement purposes. Cf. §552(b)(2) ("related solely to the internal personnel rules and practices of an agency"). Therefore, it may be enough that law enforcement purposes are a significant reason for the compilation.

In this case, the Navy has a fair argument that the Explosive Safety Quantity Distance (ESQD) information falls within Exemption 7(F). The ESQD information, the Navy argues, is used "for the purpose of identifying and addressing security issues" and for the "protection of people and property on the base, as well as in [the] nearby community, from the damage, loss, death, or injury that could occur from an accident or breach of security." Brief for Appellee in No. 07–36056 (CA9), pp. 39–40. If, indeed, the ESQD information was compiled as part of an effort to prevent crimes of terrorism and to maintain security, there is a reasonable argument that the information has been "compiled for law enforcement purposes." §552(b)(7). Assuming that this threshold requirement is satisfied, the ESQD information may fall comfortably within Exemption 7(F).

# SUPREME COURT OF THE UNITED STATES

No. 09–1163

GLEN SCOTT MILNER, PETITIONER *v.* DEPARTMENT
OF THE NAVY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 7, 2011]

JUSTICE BREYER, dissenting.

Justice Stevens has explained that, once "a statute has been construed, either by this Court *or by a consistent course of decision by other federal judges* and agencies," it can acquire a clear meaning that this Court should hesitate to change. See *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 268 (1987) (opinion concurring in part and dissenting in part) (emphasis added). See also *Commissioner* v. *Fink*, 483 U. S. 89, 104 (1987) (Stevens, J., dissenting); B. Cardozo, The Nature of the Judicial Process 149 (1921). I would apply that principle to this case and accept the 30-year-old decision by the D. C. Circuit in *Crooker* v. *Bureau of Alcohol, Tobacco & Firearms*, 670 F. 2d 1051 (1981) (en banc), as properly stating the law.

For one thing, the *Crooker* decision, joined by 9 of the 10 sitting Circuit Judges, has been consistently followed, or favorably cited, by every Court of Appeals to have considered the matter during the past 30 years. See *ibid.* (written by Judge Edwards, and joined by Chief Judge Robinson and Judges Wright, MacKinnon, Robb, Wald, Mikva, and then-Judge Ginsburg, with Judge Tamm concurring in the result and Judge Wilkey dissenting); *Massey* v. *FBI*, 3 F. 3d 620, 622 (CA2 1993); *Kaganove* v. *EPA*, 856 F. 2d 884, 889 (CA7 1988), cert. denied, 488 U. S. 1011 (1989);

*Dirksen* v. *HHS*, 803 F. 2d 1456, 1458 (CA9 1986).  Three Circuits adopted a different approach in the 1970's *before Crooker was decided*, see *ante*, at 3–4, n. 2, but I read subsequent decisions in two of those Circuits as not adhering to their early positions.  See *Abraham & Rose, PLC* v. *United States*, 138 F. 3d 1075, 1080–1081 (CA6 1998) (finding *Crooker*'s textual analysis "sound and persuasive," and noting that FBI symbols "used internally to identify confidential sources" may be withheld); *Sladek* v. *Bensinger*, 605 F. 2d 899, 902 (CA5 1979) (expressly reserving judgment on the *Crooker* issue).  As for the remaining Circuit, its district courts understand *Crooker* now to apply.  See, *e.g.*, *Gavin* v. *SEC*, No. 04–4522, 2007 WL 2454156, *5–*6 (D Minn., Aug. 23, 2007); see also *McQueen* v. *United States*, 264 F. Supp. 2d 502, 528 (SD Tex. 2003), aff'd, 100 Fed. Appx. 964 (CA5 2004) (*per curiam*)*; Tickel* v. *IRS*, No. 1–85–709, 1986 WL 14436, *2–*3 (ED Tenn., Aug. 22, 1986).  I recognize that there is reasonable ground for disagreement over the precise status of certain pre-*Crooker* precedents, but the *Crooker* interpretation of Exemption 2 has guided nearly every Freedom of Information Act (FOIA) case decided over the last 30 years.  See generally Dept. of Justice, Guide to Freedom of Information Act, pp. 184–206 (2009) (FOIA Guide) (identifying over 100 district court decisions applying the *Crooker* approach, and one appearing to reject it).

Congress, moreover, well aware of *Crooker,* left Exemption 2, 5 U. S. C. §552(b)(2), untouched when it amended the FOIA five years later.  See S. Rep. No. 98–221, p. 25 (1983) (discussing *Crooker*); Freedom of Information Reform Act of 1986, 100 Stat. 3207–48 (amending Exemption 7, 5 U. S. C. §552(b)(7)).

This Court has found that circumstances of this kind offer significant support for retaining an interpretation of a statute that has been settled by the lower courts.  See *General Dynamics Land Systems, Inc.* v. *Cline*, 540 U. S.

581, 593–594 (2004); *Evans* v. *United States*, 504 U. S. 255, 268–269 (1992); *Newman-Green, Inc.* v. *Alfonzo-Larrain*, 490 U. S. 826, 833 (1989); *Monessen Southwestern R. Co.* v. *Morgan*, 486 U. S. 330, 338–339 (1988); *Lindahl* v. *Office of Personnel Management*, 470 U. S. 768, 781–783 (1985); *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 385–386 (1983); *Cannon* v. *University of Chicago*, 441 U. S. 677, 702–703 (1979); *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 731–732 (1975); *Gulf Oil Corp.* v. *Copp Paving Co.,* 419 U. S. 186, 200–201 (1974); *Blau* v. *Lehman*, 368 U. S. 403, 412–413 (1962). See generally W. Eskridge, P. Frickey, & E. Garrett, Cases and Materials on Legislation 1048 (4th ed. 2007) ("[T]he acquiescence rule can also support implicit congressional ratification of a uniform line of federal appellate interpretations . . .").

For another thing, even if the majority's analysis would have persuaded me if written on a blank slate, *Crooker*'s analysis was careful and its holding reasonable. The Circuit Court examined the statute's language, the legislative history, and the precedent. It recognized that the exemption's words ("related solely to the internal personnel rules and practices of an agency") could easily be read, as the Court reads them today, to refer only to human resources rules and practices. See 670 F. 2d, at 1056–1057. But it also thought that those words could be read more broadly as referring to internal rules or practices that set forth criteria or guidelines for agency personnel to follow in respect to purely internal matters (as long as the information at issue was "not of legitimate public interest"). *Id.*, at 1056, 1057.

The D. C. Circuit agreed with today's Court that the Senate Report described the exemption as referring to "'internal personnel'" matters, giving as examples "'personnel's use of parking facilities, . . . sick leave, and the like.'" *Id.*, at 1058–1059 (quoting S. Rep. No. 813, 89th

Cong., 1st Sess., p. 8 (1965)). But it also noted that the House Report described the exemption as protecting from disclosure "'[o]perating rules, guidelines, and manuals of procedure for Government investigators or examiners.'" 670 F. 2d, at 1060 (quoting H. R. Rep. No. 1497, 89th Cong., 2d Sess., p. 10 (1966)). "[U]pon reflection," it thought the views of the two Houses "reconcilable" if one understood *both* sets of examples as referring to internal staff information (both minor personnel matters and staff instruction matters) that the public had no legitimate interest in learning about. 670 F. 2d, at 1065. And it accepted this view in light of its hesitation to "apply individual provisions of the statute woodenly, oblivious to Congress' intention that FOIA not frustrate law enforcement efforts." *Id.*, at 1066. At the same time it found no other exemption that would protect internal documents in which there is no legitimate public interest in disclosure—a category that includes, say, building plans, safe combinations, computer passwords, evacuation plans, and the like.

After examining in depth the legislative history and relevant precedent, the court adopted an approach based on a prior opinion by Circuit Judge Leventhal, as well as language used by this Court in *Department of Air Force* v. *Rose*, 425 U. S. 352, 369 (1976). The D. C. Circuit held that a document fits within the literal language of Exemption 2 and is exempt from disclosure *if* (1) it "meets the test of 'predominant internality,'" *i.e.*, the document is "not of legitimate public interest," *and* (2) "disclosure significantly risks circumvention of agency regulations or statutes." *Crooker*, *supra*, at 1056, 1074; see also *Rose*, *supra*, at 369 (suggesting that Exemption 2 might apply where "disclosure may risk circumvention of agency regulation"). This test, based upon Congress' broader FOIA objectives and a "common sense" view of what information Congress did and did not want to make available, *Crooker*,

*supra*, at 1074, takes the "practical approach" that this Court has "consistently . . . taken" when interpreting the FOIA, *John Doe Agency* v. *John Doe Corp.*, 493 U. S. 146, 157 (1989).

I would not underestimate the importance of this "practical approach." It reflects this Court's longstanding recognition that it cannot interpret the FOIA (and the Administrative Procedure Act (APA) of which it is a part) with the linguistic literalism fit for interpretations of the tax code. See generally 1 R. Pierce, Administrative Law Treatise §7.1, p. 413 (4th ed. 2002) ("Judicial interpretation of the malleable language of the APA has produced changes in the rulemaking procedure that could be characterized as revolutionary if they had been affected in a day or a year rather than gradually over a period of decades"); cf. Sunstein & Vermeule, Interpretation and Institutions, 101 Mich. L. Rev. 885, 917–918, and n. 111 (2003) (observing that Congress "appears to rely on courts for long periods of time" to give meaning to the APA, which justifies interpreting it less formalistically than statutes like "the Internal Revenue Code"). That in large part is because the FOIA (like the APA but unlike the tax code) must govern the affairs of a vast Executive Branch with numerous different agencies, bureaus, and departments, performing numerous tasks of many different kinds. Too narrow an interpretation, while working well in the case of one agency, may seriously interfere with congressional objectives when applied to another. The D. C. Circuit's answer to this legal problem here was to interpret Exemption 2 in light of Congress' basic effort to achieve a "workable balance between the interests of the public in greater access to information and the needs of the Government to protect certain kinds of information from disclosure." *John Doe Agency*, *supra,* at 157. See also S. Rep. No. 1219, 88th Cong., 2d Sess., 8, 11 (1964) (emphasizing this "workable" balance); S. Rep. No. 813, at 3, 5

(same); H. R. Rep. No. 1497, at 2, 6 (same).

Further, 30 years of experience with *Crooker*'s holding suggests that it has not seriously interfered with the FOIA's informational objectives, while at the same time it has permitted agencies to withhold much information which, in my view, Congress would not have wanted to force into the public realm. To focus only on the case law, courts have held that that information protected by Exemption 2 includes blueprints for Department of Agriculture buildings that store biological agents, *Elliot* v. *Department of Agriculture*, 518 F. Supp. 2d 217 (DC 2007); documents that would help hackers access National Aeronautics and Space Administration computers, *Knight* v. *NASA*, No. 2:04–cv–2054–MCE–GGH, 2006 WL 3780901, *6 (ED Cal., Dec. 21, 2006); agency credit card numbers, *Judicial Watch, Inc.* v. *Department of Commerce*, 83 F. Supp. 2d 105, 110 (DC 1999); Commodity Futures Trading Commission guidelines for settling cases, *Shumaker, Loop & Kendrick, LLP* v. *Commodity Futures Trading Comm'n*, No. 3:97 CV 7139, 1997 U. S. Dist. LEXIS 23993, *10–*15 (ND Ohio, May 27, 1997); "trigger figures" that alert the Department of Education to possible mismanagement of federal funds, *Wiesenfelder* v. *Riley*, 959 F. Supp. 532, 536 (DC 1997); security plans for the Supreme Court Building and Supreme Court Justices, *Voinche* v. *FBI*, 940 F. Supp. 323, 328–329 (DC 1996); vulnerability assessments of Commerce Department computer security plans, *Schreibman* v. *Department of Commerce*, 785 F. Supp. 164, 165–166 (DC 1991); Bureau of Prisons guidelines for controlling riots and for storing hazardous chemicals, *Miller* v. *DOJ*, No. 87–0533, 1989 WL 10598 (DC, Jan. 31, 1989); guidelines for assessing the sensitivity of military programs, *Institute for Policy Studies* v. *Department of Air Force*, 676 F. Supp. 3, 4–5 (DC 1987); and guidelines for processing Medicare reimbursement claims, *Dirksen,* 803 F. 2d, at 1458–1459.

In other Exemption 2 cases, where withholding may seem less reasonable, the courts have ordered disclosure. Cf. *ante*, at 16, n. 9 (citing *Audubon Society* v. *Forest Serv.*, 104 F. 3d 1201, 1203 (CA10 1997), and *Maricopa Audubon Soc.* v. *Forest Serv.*, 108 F. 3d 1082, 1084 (CA9 1997)). See generally FOIA Guide 201, and n. 106 (citing nine decisions applying the *Crooker* approach but nonetheless requiring disclosure).

The majority acknowledges that "our decision today upsets three decades of agency practice relying on *Crooker*, and therefore may force considerable adjustments." *Ante*, at 18. But how are these adjustments to be made? Should the Government rely upon other exemptions to provide the protection it believes necessary? As JUSTICE ALITO notes, Exemption 7 applies where the documents consist of "records or information compiled for law enforcement purposes" and release would, *e.g.*, "disclose techniques and procedures for law enforcement investigations," or "could reasonably be expected to endanger the life or physical safety of any individual." 5 U. S. C. §552(b)(7). But what about information that is *not* compiled for law enforcement purposes, such as building plans, computer passwords, credit card numbers, or safe deposit combinations? The Government, which has much experience litigating FOIA cases, warns us that Exemption 7 "targets only a subset of the important agency functions that may be circumvented." Brief for Respondent 52–53. Today's decision only confirms this point, as the Court's insistence on narrow construction might persuade judges to avoid reading Exemption 7 broadly enough to provide *Crooker*-type protection.

The majority suggests that the Government can classify documents that should remain private. *Ante*, at 18. See 5 U. S. C. §552(b)(1) (permitting withholding of material "properly classified" as authorized to be "kept secret in the interest of national defense or foreign policy"). But classi-

fication is at best a partial solution. It takes time. It is subject to its own rules. As the Government points out, it would hinder the sharing of information about Government buildings with "first responders," such as local fire and police departments. Brief for Respondent 53–54. And both Congress and the President believe the Nation currently faces a problem of too much, not too little, classified material. See Reducing Over-Classification Act, 124 Stat. 2648; Exec. Order No. 13526, §§1.3(d), 2.1(d), 5.4(d)(10), 3 CFR 298, 299–300, 304, 321 (2009 Comp.). Indeed, Congress recently found:

> "The 9/11 Commission and others have observed that the over-classification of information interferes with accurate, actionable, and timely information sharing, increases the cost of information security, and needlessly limits stakeholder and public access to information.
>
> "Over-classification of information causes considerable confusion regarding what information may be shared with whom, and negatively affects the dissemination of information within the Federal Government and with State, local, and tribal entities, and with the private sector." Reducing Over-Classification Act, §§2(2), (3), 124 Stat. 2648.

These legislative findings suggest that it is "over-classification," not *Crooker,* that poses the more serious threat to the FOIA's public information objectives.

That leaves congressional action. As the Court points out, Congress remains free to correct whatever problems it finds in today's narrowing of Exemption 2. But legislative action takes time; Congress has much to do; and other matters, when compared with a FOIA revision, may warrant higher legislative priority. In my view, it is for the courts, through appropriate interpretation, to turn Congress' public information objectives into workable agency

practice, and to adhere to such interpretations once they are settled.

That is why: Where the courts have already interpreted Exemption 2, where that interpretation has been consistently relied upon and followed for 30 years, where Congress has taken note of that interpretation in amending other parts of the statute, where that interpretation is reasonable, where it has proved practically helpful and achieved commonsense results, where it is consistent with the FOIA's overall statutory goals, where a new and different interpretation raises serious problems of its own, and where that new interpretation would require Congress to act just to preserve a decades-long status quo, I would let sleeping legal dogs lie.

For these reasons, with respect, I dissent.